728 A.2d 743

**Maxine BELL, Individually, etc.**

v.

**HEITKAMP, INC., et al.**

**No. 460, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 28, 1999.

---

Kathy Brissette-Minus (James H. Taylor on the brief), Largo, for appellants.

Timothy J. Mulreamy (Anderson & Quinn, on the brief for appellee, Heitkamp, Inc.), Rockville; George M. Church (Church & Houff, P.A., on the brief for appellee, Jaci), Town-

son; John O'Neill, Jr., Rockville, for appellee Washington Suburban Sanitary Commission.

Argued before SALMON, BYRNES and JOHN J. BISHOP, Jr., (Ret., Specially Assigned), JJ.

SALMON, Judge.

This case arises out of a wrongful death/survival action where, for purposes of this appeal, it was conceded that the defendants breached their duty of care owed to the deceased. The central issue presented is whether the plaintiffs—when responding to defendants' motion for summary judgment—set forth sufficient evidence from which a trier of fact could find that the defendants' breach of duty was the proximate cause of the decedent's injuries. The trial judge was of the view that the plaintiff could not prove proximate cause. He also ruled that the *res ipsa loquitur* doctrine was inapplicable and, accordingly, granted summary judgment in favor of all defendants on the issue of liability. In addition, he granted summary judgment as to two subsidiary issues. The four questions raised by plaintiffs/appellants in this appeal are:

1. Did the trial court err in granting the defendants' motion for summary judgment on the ground that plaintiffs had insufficient proof that defendants' breach of duty was the proximate cause of the decedent's injuries?

2. Did the trial court err when it ruled that the doctrine of *res ipsa loquitur* has no application in the case *sub judice?*

3. Did the trial court err in granting defendants' motion for summary judgment regarding the issue of punitive damages?

4. Did the trial court err in granting summary judgment as against the minor plaintiff on the ground that he had no right under the wrongful death statute to bring a wrongful death action?

## I. *FACTS*

### A. Background

The facts are set forth in the light most favorable to the plaintiffs/appellants. Md. Rule 2–501. Many of the facts are disputed by appellees.

On August 22, 1995, Jabbouri McClamb's corpse was found lying, face up, under two feet of water in a hole that had been dug recently by an employee of Jaci General Contractors, Inc. (hereafter "Jaci"). Jabbouri McClamb (hereafter "McClamb, Sr.") had been last seen alive approximately thirteen hours prior to the discovery of his body. The deceased was single, twenty-three years old, and survived by, *inter alia,* his mother, Maxine Bell—one of the appellants. Approximately seven months after McClamb, Sr.'s death, Jabbouri McClamb, Jr. (hereafter "McClamb, Jr.") was born. According to McClamb, Jr.'s mother, Sharon Baker, the father of the child was McClamb, Sr.

The hole where McClamb, Sr.'s body was found (hereafter "Hole No. 3") was situated on a strip of land that was located between Muncy Road and Martin Luther King Highway in Landover, Maryland. The owner of the land was Prince George's County. Washington Suburban Sanitary Commission (WSSC) had an easement to use the strip for maintenance of its underground pipes. The strip was 20 feet wide and 227 feet long and was used by members of the public as a footpath between the aforementioned two roadways. The footpath was one foot wide, and portions of the path were surrounded by woods. At all times here pertinent the landscape surrounding the path was marred by garbage, trash, and other debris.

The WSSC, on June 24, 1993, contracted with Heitkamp, Inc. ("Heitkamp"), to do some repair work to its lines located beneath the strip. Heitkamp, in turn, subcontracted with Jaci to dig three holes in the strip. Two of the holes were dug, repairs were made, and the holes covered without incident. Hole No. 3, the last of the three holes dug, was approximately nine feet deep, eight feet wide, and six feet long. The hole was dug on August 18, 1993. On the same day the hole was

created, workers employed by Heitkamp shored up the hole by bracing the walls with wooden supports and installing a "shoring box" at the hole's bottom. Dirt was piled up on both sides of the hole in depths varying between two and four feet. The hole and the dirt that surrounded it were enclosed by a plastic orange mesh fence that was four feet in height.[1] The fence was supported by six foot iron poles that were driven into the ground. No lights or warning signs were put up near the hole, and the hole was uncovered.

Herman Malone ("Mr. Malone") lived at 7702 Muncy Road in Landover, which is only one lot away from the pathway that runs between Muncy Road and Martin Luther King Highway. Prior to the accident, Mr. Malone talked to two of the men who had dug Hole No. 3. He told the men that he felt it was dangerous for them to leave Hole No. 3 uncovered when they were not in the vicinity because many people, including children, used the pathway. Showing unusual foresight, Mr. Malone warned the workmen, "Something is going to go wrong here sooner or later." Thereafter—Mr. Malone does not remember the exact date except that it was before McClamb, Sr.'s death—he took numerous Polaroid pictures showing work that WSSC had done in or near the accident site. Included among the photographs are several depicting Hole No. 3 and the area that surrounded it.

## B. Happening of the Accident

Curtis Malone ("Curtis"), son of Herman Malone, spent Saturday, August 21, 1993, in the company of McClamb, Sr. After attending an outdoor barbeque and a basketball game together, the two returned to Curtis's father's home located at 7702 Muncy Road, where they stayed for an hour or two. Next, in the late hours of August 21st or the early hours of the 22nd, they decided to take a ride in an automobile that was on

---

1. In oral argument, counsel for the plaintiffs/appellants said that the record contained evidence that the fence was two feet in height. Counsel was in error. Unrebutted deposition testimony of David Eberly, corroborated by pictures submitted to the motions court by plaintiffs'/appellants' attorney, show that the fence was four feet tall.

loan to Curtis. Curtis drove to Route 202 where he stopped at a traffic light. About that time, Curtis noticed five or six police cars tailing him—albeit with neither their lights nor sirens activated. After the light turned green, Curtis made a "U" turn and accelerated back toward his home. The police cars then activated their lights and sirens and gave chase. Curtis elected to try to elude the police because (according to his deposition testimony) he feared a police beating if he were stopped in an isolated area where there were no civilian witnesses. While the police were chasing the vehicle, McClamb, Sr., told Curtis that he did not want to be stopped by the police because he feared that he would be arrested because (he thought) there was an outstanding warrant for his arrest. After a short chase, Curtis came to a stop in front of his father's home where several persons, including Herman Malone, had gathered. The police immediately arrested Curtis, but McClamb, Sr., got out of the vehicle and ran down the footpath toward Hole No. 3. The pathway was pitch dark. McClamb, Sr., was last seen being chased down the footpath by a Prince George's County police officer—who had his gun drawn.

After seven to ten minutes, the officer who had chased McClamb, Sr., returned empty handed to the area where Curtis had been apprehended. Curtis was then taken to police headquarters, kept for several hours, and charged with numerous traffic offenses—including fleeing and eluding a police officer. When Curtis was released by the police, he tried to get in contact with McClamb, Sr., by paging him but got no response.

On Sunday, August 22 nd, between 11 a.m. and 1 p.m., Curtis's father, Herman Malone, was walking on the path between Muncy Road and Martin Luther King Highway. When he approached Hole No. 3, he noticed a baseball cap within the fenced area surrounding the hole. He kept on walking toward a Mobil station located on Martin Luther King Highway. After purchasing soft drinks at the station, he retraced his steps, walking on the footpath back toward Hole No. 3. When he arrived at the hole, he looked around for a

stick to retrieve the baseball cap. While doing so, he noticed McClamb, Sr.'s body at the bottom of the hole. He also noticed that there was a "break" in the orange plastic mesh fence. In Herman Malone's words, the break was from the "top to the bottom" of the fence. He was not precise as to exactly where the tear was located (at least in the portion of the record that was before the motions court), but he said that, if one were using the path going from Muncy Road to Martin Luther King Highway, the break in the fence would be on the right and on the side closest to Muncy Road.[2]

On August 23, 1993, an autopsy was performed on McClamb, Sr.'s body. It showed that the deceased was 5'8" and weighed 185 pounds. A test revealed that his urine contained 0.06% alcohol. Time of death was not estimated. The cause of death was listed as "drowning, complicating head injuries." The autopsy report said that McClamb, Sr., had numerous injuries and/or abnormalities, viz:

1. Blood in the right external auditory canal with possible skull fracture.

2. Abrasions on the protuberant parts of the face.

3. Chipped right upper front tooth.

4. Lacerations of the lower lip.

5. Laceration of the internal oral mucosa opposite the upper lip. All constant with marks from subject on teeth.

6. A subgalcal hemorrhage in the right temporo-parietal intracranial area.

7. Lacerations of the back.

8. Abrasion of the left anterior forearm.

9. Abrasion from the left elbow.

---

**2.** Herman Malone was evidently the only witness to see the tear in the fence. He was not asked at deposition whether the fence was broken when he first passed Hole No. 3 on August 22nd or whether he simply did not notice the break at that time.

10. Abrasion at base of the left thumb, posterior hand and wrist.

11. Abrasion of the right thigh.

12. Abrasion of the left thigh.

13. Abrasion of the left medial ankle.

14. Markedly edematous lungs weight 800 grams (right), and 780 grams (left).

15. Pleural effusion bilaterally.

16. Pulmonary parenchyma was red-purple, exuding marked amounts of blood and frothy fluid.

The assistant medical examiner who authored the autopsy report concluded:

*OPINION:*

This 22 [sic] year old, Black male, JABBOURI MCCLAMB, died of drowning while running from the police having slammed into the irregular hard wall of a construction ditch which contained water, struck his head, became unconscious and ended up face up under the water at the bottom. The multiple abrasions on the head and extremities were consistent with this course of events. The manner of death is ACCIDENT. The deceased had been consuming alcoholic beverages prior to death.

## C. Procedural History

On October 24, 1994, Maxine Bell, individually and as guardian of McClamb, Jr., filed a Complaint against Heitkamp for wrongful death. She also brought a survival action as the personal representative of the estate of McClamb, Sr. The complaint alleged that Heitkamp, a general contractor, was responsible for supervising, controlling, and maintaining the construction excavation in which McClamb, Sr.'s body was found. On March 18, 1996, an Amended Complaint was filed substituting Sharon Baker as mother and next friend of McClamb, Jr. The Amended Complaint also named WSSC and Jaci as additional defendants.

After conducting substantial discovery, Heitkamp filed a Motion for Summary Judgment, arguing, *inter alia*, (i) the plaintiffs were unable to establish a causal nexus between any alleged acts or omissions by the defendants and McClamb, Sr.'s death; and (ii) McClamb, Jr., did not have a cause of action for wrongful death under Maryland law. Shortly thereafter, WSSC and Jaci joined in Heitkamp's Motion for Summary Judgment.

On August 14, 1997, a Second Amended Complaint was filed that alleged that the defendants had intentionally failed to "cover or plate" Hole No. 3. The Personal Representative of McClamb, Sr.'s estate characterized the negligence of the defendants as constituting "implied malice" and prayed for an award of $30,000,000 in punitive damages. WSSC and Jaci subsequently filed motions to dismiss the claim for punitive damages; Heitkamp, in turn, filed a Motion for Partial Summary Judgment as to the punitive damage issue.

On December 4, 1997, the trial judge granted the various defense motions concerning punitive damages, the wrongful death claim on behalf of McClamb, Jr., and ultimately granted summary judgment to all defendants as to liability after determining that there was insufficient evidence to establish that any breach of duty by the defendants was a proximate cause of the death of McClamb, Sr.

## II. *STANDARD OF REVIEW*

A trial court may grant summary judgment only if "the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). In reviewing a summary judgment motion, we consider the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the non-moving party. *See Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 345, 658 A.2d 675 (1995); *Richman v. FWB Bank*, 122 Md.App. 110, 146, 712 A.2d 41, *cert. granted*, 351 Md. 285, 718 A.2d 233 (1998). To defeat a motion

for summary judgment, the non-moving party must establish that a genuine dispute exists as to a material fact by proffering facts that would be admissible in evidence. *See A.J. Decoster Co. v. Westinghouse Elec. Corp.,* 333 Md. 245, 261, 634 A.2d 1330 (1994); *Moura v. Randall,* 119 Md.App. 632, 640, 705 A.2d 334, *cert. denied,* 349 Md. 495, 709 A.2d 140 (1998). The appellate court determines whether there was a genuine issue of material fact and whether the trial court was legally correct. *See Decoster,* 333 Md. at 261, 634 A.2d 1330; *Richman,* 122 Md.App. at 147, 712 A.2d 41; *Woodward v. Newstein,* 37 Md.App. 285, 290, 377 A.2d 535 (1977). In reviewing a grant of summary judgment, the appellate court ordinarily reviews only the grounds relied upon by the trial court. *See Post v. Bregman,* 349 Md. 142, 158–59, 707 A.2d 806 (1998); *Kimmel v. SAFECO Ins. Co.,* 116 Md.App. 346, 354, 696 A.2d 482 (1997).

## III.

### A. Proximate Cause

The trial judge assumed, for purposes of the summary judgment motion only, that all three defendants had breached their duty to the decedent when they (1) failed to cover Hole No. 3 and (2) failed to warn McClamb, Sr., of the danger posed by the uncovered hole. But a defendant's breach of duty, standing alone, does not mean that a defendant is negligent. The breach of duty must proximately cause injury to the plaintiff. *Medina v. Meilhammer,* 62 Md.App. 239, 247, 489 A.2d 35 (1985) (citing *Campbell v. State, Use of Dix,* 203 Md. 338, 346, 100 A.2d 798 (1953); *Dalmo Sales of Wheaton, Inc. v. Steinberg,* 43 Md.App. 659, 672–73, 407 A.2d 339 (1979)). "[N]egligence is the proximate cause of an injury when the injury is the natural and probable result or consequence of the negligent act or omission." *Id.* According to appellees:

> Appellants set forth absolutely no facts which would establish that either the failure to cover the hole or the failure to warn McClamb played any part in McClamb's entering the

hole. Without such facts, the [a]ppellants are unable to establish the causation element of their claim.

■ Indisputably, appellants did not prove by *direct* evidence when McClamb, Sr., died or the mechanics of how he ended up at the bottom of Hole No. 3. The question then becomes whether plaintiffs/appellants presented to the motions court circumstantial evidence from which a trier of fact could infer how the accident occurred and, if so, whether, based on those inferred facts, defendants' (assumed) breaches of duty proximately caused McClamb, Sr.'s drowning death.

The problem here presented is somewhat similar to the one that faced the Court in *Unsatisfied Claim and Fund Bd. v. Bowles*, 25 Md.App. 558, 334 A.2d 532 (1975). In *Bowles*, the plaintiff was injured while walking along the shoulder of a highway when all of a sudden he was rendered unconscious ("the lights went out"). *Id.* at 559, 334 A.2d 532. Prior to being struck, the plaintiff heard nothing, and there were no witnesses to the accident. *Id.* at 560, 334 A.2d 532. The plaintiff was discovered, unconscious, two to three feet off the traveled portion of the highway by a passing motorist. He had sustained a severe laceration to his right thigh, a fractured femur and right wrist, and multiple lacerations to his legs. *Id.* One of the defenses raised in *Bowles* was that the plaintiff had failed to show that his injuries were proximately caused by the defendant. *Id.* at 562, 334 A.2d 532. The defendant pointed out that, in order to successfully sue the Unsatisfied Claim and Judgment Fund Board, plaintiff was required to prove that he had been injured by a motor vehicle. It argued that, for all that was shown in the record, plaintiff could have been injured by a mugger or by a horse or a bicycle or some other non-motorized instrumentality. This argument was rejected. *Id.* The *Bowles* Court said:

The defendant claimed [in *Otis Elevator Co. v. LePore*, 229 Md. 52, 181 A.2d 659 (1962),] the plaintiff had failed to show that its negligence had been a proximate cause of his injuries. The Court affirmed the judgment and stated what is known as the "more probable than not" rule:

*"Prosser, Torts* (2nd ed.), § 44, sets forth the true test concerning the legal sufficiency of evidence on this point as follows:

'Plaintiff is not, however, required to ... negative entirely the possibility that the defendant's conduct was not a cause, and it is enough that he introduces evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no man can say with absolute certainty what would have occurred if the defendant had acted otherwise.' " *Otis Elevator v. LePore, supra* at 58, 181 A.2d 659.

It is thus clear that a plaintiff need not exclude every possible cause of his injury other than the defendant's negligence. *Peterson v. Underwood,* 258 Md. 9, 17, 264 A.2d 851 (1970).

In the case at bar the evidence clearly shows that it was more probable than not that a motor vehicle was responsible for appellee's injury. Any other conclusion would be contrary to common sense and the facts. We therefore find that appellee produced sufficient evidence to go to the jury on this issue.

*Id.* at 562–63, 334 A.2d 532.

The "more probable than not" rule is implemented by the use of inferences. The test for the legitimacy of an inference was explained by the late Judge Charles Orth in *C & P Tel. Co. v. Hicks,* 25 Md.App. 503, 337 A.2d 744 (1975), as follows:

The test for the legitimacy of an inference is often expressed in this way: "where from the facts most favorable to the plaintiff the nonexistence of the fact to be inferred is just as probable as its existence (or more probable than its existence), the conclusion that it exists is a matter of speculation, surmise, and conjecture, and a jury will not be permitted to draw it." *Id.* This test is directed to the court's function and not to the jury's. "The court must determine whether the existence of fact A (which has been

testified to) is more probable than not, *as a generalization,* attended by the coexistence of fact B. If the court makes the initial determination in favor of the legitimacy of the inference, the issue goes to the jury to determine whether upon the preponderance of the evidence *in this case* they find (a) that fact A probably *did exist* and, if so, whether fact B probably *did exist* (again, in this case)." [2 F. Harper & F. James, *The Law of Torts* § 19.4], pp. 1068–1069. This view was adopted by the Court of Appeals in *Short v. Wells,* 249 Md. 491, 495–496, 240 A.2d 224 [1968]. *Id.* at 524–25, 337 A.2d 744 (footnote omitted).

In the case at hand, at least three possible scenarios fail the "more probable than not" test. It is theoretically possible, as appellees suggested below, that the police officer who was chasing McClamb, Sr., threw him in Hole No. 3.[3] Common sense tells us that this scenario is not probable. The officer did not know McClamb, Sr., and would have no conceivable motive to act in such a bizarre manner. Why would a police officer throw a stranger into a deep hole and then abandon him? No facts suggest he did so. As pointed out in *Bowles,* the appellants were not required to negate bizarre possibilities of this sort.

It is also "possible" that McClamb, Sr., fell into the hole during daylight hours, many hours after the police chase. But this is also unlikely in the extreme because the hole was surrounded by a fence and the danger of the hole in daylight is open and obvious. During daylight hours, McClamb, Sr., would have to have been blind, or nearly so, for him to have fallen accidentally into the hole—and nothing in the record suggests that McClamb, Sr.'s eyesight was defective. Another

---

**3.** If the officer had thrown McClamb, Sr., into the hole, the officer's intervening acts would be unforeseeable, and this would eliminate the failure to cover the hole as the proximate cause of McClamb, Sr.'s drowning death. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 159, 642 A.2d 219 (1994) (proximate cause "must be the natural and probable consequence of the negligent act, unbroken by any intervening agency . . . ." (quoting *Bloom v. Good Humor Ice Cream Co. of Baltimore,* 179 Md. 384, 389, 18 A.2d 592 (1941)).

possibility—according to appellees—is that the decedent may have intentionally jumped into the hole to hide from the police. This possibility is also unlikely. McClamb, Sr., did not live anywhere near the place where he died, and there is nothing to suggest that he knew that a hole existed. Moreover, according to appellants' proffered evidence, it was "pitch black" in the vicinity of the hole. If it was pitch black, it follows that he could not have even seen the hole.[4] Additionally, the type and number of lacerations and abrasions received by the decedent would be unlikely if he intentionally jumped to the bottom of the hole.

> Appellees argue that the appellants were unable to prove: [T]he date the decedent entered the hole; the time he entered the hole; how the decedent came to enter the hole (jumped, tripped, pushed, thrown, etc.); whether the decedent was walking or running when he entered the hole; the direction from which the decedent entered the hole (from Muncy Road, Martin Luther King Boulevard, or one of the two sides); the physical point of entry into the hole; and, the manner of entry into the hole (head-first, feet-first, etc.).

In our view, the facts that were proven were sufficient for a jury to infer properly that the accident occurred in the manner that the writer of the autopsy report believed it did. As mentioned earlier, the medical examiner opined that the multiple abrasions to the decedent's head and extremities were consistent with the theory that McClamb, Sr., was running when he slammed into the wooden side of Hole No. 3. If he had been walking, it seems unlikely that he would have had so many abrasions. Under some circumstances, a body in motion tends to stay in motion; and if a person is running down a relatively short path with a policeman chasing him, it is likely that the person will continue running until (1) he is caught, (2) he comes to the end of the path, or (3) something stops his flight. Moreover, the fact that McClamb, Sr., was running

---

4. The failure to cover the hole would not be the proximate cause of McClamb, Sr.'s injuries if he intentionally jumped in. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. at 159, 642 A.2d 219 (1994).

from the police at the time of his injury is consistent with the fact that the orange plastic fence was broken on the side nearest Muncy Road (the direction the decedent was coming from during the chase). A jury could reasonably conclude that it would be unlikely that a 5'8", 185 pound walking man could jump over a four-foot fence or that he could walk into a plastic fence and break it clear through.

Hole No. 3, according to appellees, was dug on August 18th. Herman Malone said he took the pictures of Hole No. 3 before the accident. The pictures show that the fence was intact when the pictures were taken. The fence was broken from top to bottom 13 hours after the chase according to Herman Malone. This does not *necessarily* mean for certain that McClamb, Sr., broke the fence, but under the circumstances, a jury could infer that it is more probable than not that the fence was broken by McClamb, Sr., immediately before he fell.

It is true, as appellees point out, that a fact finder could not infer, from the evidence presented to the motions court, the exact "point of entry into the hole." But plaintiffs/appellants were not required to prove the exact mechanics of injury. Instead, for purposes of the motion—a breach of duty having been conceded—they had the burden of proving that the failure to cover the open hole, more probably than not, proximately caused McClamb, Sr.'s drowning death. We conclude that appellants met that burden.

### B. Res Ipsa Loquitur

■ Successful reliance upon the doctrine of *res ipsa loquitur* requires proof of each of the following: first, a causality of a sort that usually does not occur in the absence of negligence; second, caused by an instrumentality within the defendant's exclusive control; and finally, circumstances indicating that the casualty did not result from the act or omission of the plaintiff. *See Meda v. Brown,* 318 Md. 418, 423, 569 A.2d 202 (1990); *Munzert v. American Stores Co.,* 232 Md. 97, 104, 192 A.2d 59 (1963).

■ *Burkowske v. Church Hosp. Corp.*, 50 Md.App. 515, 439 A.2d 40 (1982), involved a case where a plaintiff was injured when a bench, located in a hospital corridor, collapsed as the plaintiff sat on it. We concluded that *"res ipsa loquitur* was not available ... since the [bench] was not in the sole control of appellees...." 50 Md.App. at 523, 439 A.2d 40. Given the facts presented in the case at hand, the lower court was correct in holding that *res ipsa loquitur* was inapplicable to this case. The area where the excavations occurred was not within the exclusive control of any of the three appellees. The land was owned by Prince George's County, and none of the appellees was present on site at the time of injury. Absent such "exclusive control," the doctrine of *res ipsa loquitur* was inapplicable.

Aside from the above, it is crystal clear that the third element of the *res ipsa loquitur* doctrine was also not present. Contributory negligence "is the doing of something that a person of ordinary prudence would not do, or the failure to do something that a person of ordinary prudence would do ... under the circumstances." *Baltimore Gas and Elec. Co. v. Flippo*, 348 Md. 680, 703, 705 A.2d 1144 (1998) (quoting *Campfield v. Crowther*, 252 Md. 88, 93, 249 A.2d 168 (1969)). "In order to establish contributory negligence as a matter of law, 'the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds.' " *Id.* (quoting *Reiser v. Abramson*, 264 Md. 372, 378, 286 A.2d 91 (1972)).

The *only* scenario as to how this accident took place that meets the "more probable than not" test is the one set forth in the autopsy report that is discussed in Part III, A, *supra.*[5]

---

5. In their brief, appellants appear to concede that the scenario set forth in the autopsy report is what happened in the instant case. Appellants argued:

> It is within the range of foreseeability that anyone exercising ordinary care in the Muncy Road community would run through the public right-of-way and fall into a nine (9) foot hole where there is no warning and no cover other than the orange mesh fence.

Plainly, a person of ordinary prudence would not run down a "pitch black path" at night, and if he/she did so, that person, as a matter of law, would be guilty of contributory negligence. Thus, the third element of the *res ipsa loquitur* doctrine was not met.

We cannot, however, affirm the summary judgment as to liability on the basis of the decedent's contributory negligence because that ground was not relied upon by the trial judge. *Post,* 349 Md. at 158–59, 707 A.2d 806.[6]

## C. Punitive Damages

Maxine Bell, in her capacity as Personal Representative of the Estate of McClamb, Sr., contends that the trial court erred when it ruled that the estate was not entitled to collect punitive damages against the defendants. The trial judge did not err in this regard.

The Court of Appeals changed the Maryland law as to punitive damages in the case of *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 460, 601 A.2d 633 (1992), when it held that, in order to present a jury issue as to punitive damages in a non-intentional tort case, the plaintiff must prove "evil motive, intent to injure, ill will or fraud." Previously, proof of implied malice was sufficient. Four years after *Zenobia,* in *Owens–Corning Fiberglas Corp. v. Baltimore City,* 108 Md. App. 1, 7, 670 A.2d 986 (1996), we summarized the law in

---

It certainly does not appear to be foreseeable that one would run down a narrow (one-foot wide) path at night if the path was as appellants contend—"pitch dark." Appellants' star witness, Herman Malone, testified that one must be careful using the path even when walking on the path during daylight hours, viz:

Q [APPELLANTS' COUNSEL]: Have you run through that path during the day?

A No, I haven't. I always walk. It's a lot of limbs and trees and shrubberies and different things like that, so, basically, you have to pace yourself walking through there and you got to go like an upgrade to get up the hill, so it's not a flat path through there.

6. Moreover, on appeal, appellees' counsel did not argue that the court's grant of summary judgment should be affirmed due to the decedent's contributory negligence.

Maryland concerning punitive damages, saying, in pertinent part:

1. Proof of negligence alone, no matter how gross, wanton or outrageous, is not sufficient to prove punitive damages. *Zenobia, supra,* 325 Md. at 463, 601 A.2d 633; *[ACandS, Inc. v.] Godwin, supra,* 340 Md. [334,] 360[, 667 A.2d 116] [1995].

2. In order to justify a punitive damage award in a non-intentional tort case, a plaintiff must prove that the defendant acted with actual and not just implied malice. *Zenobia, supra,* 325 Md. at 460, 601 A.2d 633; *U.S. Gypsum Co. [v. Baltimore],* 336 Md. [145,] 188[, 647 A.2d 405] [1994].

Moreover, facts showing actual malice must be pleaded, and if the case goes to trial, plaintiff must prove entitlement to punitive damages by clear and convincing evidence. *Scott v. Jenkins,* 345 Md. 21, 29, 690 A.2d 1000 (1997). In the case at hand, the estate did not allege facts that would show that the defendants acted with actual malice; in fact, the estate even characterized defendant's malice as being "implied."

Appellants say in their brief, without any citation of authority:

Punitive damages are available to an injured party in a Maryland action when there is knowledge of a dangerous condition and failure to act. In this matter, the [a]ppellees failed to cover or plate the nine (9) foot hole and further failed to warn McClamb of the danger.

This is plainly not a correct statement of the current law. In fact, even prior to *Zenobia,* when it was much easier for a plaintiff to prove punitive damages, proof that a dangerous condition existed coupled with a failure to repair the condition or warn of dangers was generally *not* sufficient to prove punitive damages—as shown in *Medina,* 62 Md.App. at 251-52, 489 A.2d 35. In *Medina,* the defendants dug a hole in an effort to find the source of a leak in an underground pipe carrying scalding (180) water. Agents of the defendants, who had dug the hole, left the hole unattended. The hole was also

uncovered and otherwise unprotected even though the defendants knew that children were playing nearby. *Id.* at 247–48, 489 A.2d 35. While the workmen were away, a two-year-old child, who was playing in the vicinity, stepped or fell into the water and was severely burned. *Id.* at 243, 489 A.2d 35. We summarized the facts in *Medina* as follows:

> Appellee presented evidence, not only that appellants created a dangerous situation, but that they created it in the presence of young children and left it unattended, all with notice that the children were attracted to the water.

*Id.* at 247–48, 489 A.2d 35.

In *Medina*, using the implied malice punitive damage standard (willful, wanton, or reckless conduct and/or gross negligence), we held that the plaintiff had not proven entitlement to punitive damages. *Id.* at 250–52, 489 A.2d 35. We said:

> It is clear that the actions of appellants amounted to negligence, but, based on the standards set out in the cited cases in the *Law of Torts*, both *supra*, we must decide whether that is "an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care" and is "more than any mere mistake resulting in inexperience, excitement, or confusion ...; more than mere thoughtlessness or inadvertence, or simple inattention." *Law of Torts*.
>
> The quantity of the negligence in this case does not change the quality of that negligence so that it becomes different from ordinary lack of care. We hold that the conduct of appellants in this case, while clearly negligent, was not so extraordinary or outrageous as to raise that conduct to the qualitative level necessary to establish a foundation for the award of punitive damages.

*Medina*, 62 Md.App. at 251–52, 489 A.2d 35.

In the case *sub judice*, the breach of duty on the part of the defendants that was assumed—failure to cover Hole No. 3 and failure to warn of danger—was a far lesser breach than in *Medina*. After all, here it is undisputed that a four-foot orange fence was placed around the hole. It follows that if

the much more egregious breach of duty in *Medina* was insufficient to prove implied malice, the breach here would not be sufficient to prove actual malice.

### D. McClamb, Jr.'s Right to Bring a Wrongful Death Action

Section 3–904(h) of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol.) reads:

*Child of parents who have not participated in a marriage ceremony.*—For the purposes of this section, a person born to parents who have not participated in a marriage ceremony with each other is considered to be the child of the mother. The person is considered to be the child of the father only if the father:

(1) Has been judicially determined to be the father in a proceeding brought under § 5–1010 of the Family Law Article or § 1–208 of the Estates and Trusts Article; or

(2) Prior to the death of the child:

(i) Has acknowledged himself, in writing, to be the father;

(ii) Has openly and notoriously recognized the person to be his child; or

(iii) Has subsequently married the mother and has acknowledged himself, orally or in writing, to be the father.

At the time McClamb, Sr., died, his girlfriend, Sharon Baker, was two months pregnant. Prior to McClamb, Sr.'s death, Sharon Baker told him of her pregnancy, and McClamb, Sr., was delighted by the news. Moreover, he orally acknowledged to Maxine Bell, Curtis Malone, and Sharon Baker that he was to become the father of the baby. He never, however, acknowledged paternity in writing, and he never married Ms. Baker.

The parties are at odds over one narrow issue, viz: whether McClamb, Sr., ever "open[ly] and notoriously recognized the *person* [McClamb, Jr.] to be his child" (emphasis added) within the meaning of section 3–904(h)(2)(ii). Appellees con-

tended that he had not. The defendants'/appellees' arguments can be summed up as follows:

1. The Supreme Court has recognized that a fetus is not a "person" within the meaning of the Fourteenth Amendment. *Roe v. Wade,* 410 U.S. 113, 158, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Kandel v. White,* 339 Md. 432, 442, 663 A.2d 1264 (1995);

2. In the wrongful death statute, the word "person" is defined as "includ[ing] an individual, receiver, trustee, guardian, executor, administrator, fiduciary, or representative of any kind, or any partnership, firm, association, public or private corporation, or any other entity."

3. If, when writing the wrongful death statute, the Legislature had intended to allow an illegitimate posthumous child to establish paternity by proving that his/her father acknowledged paternity while he/she was a fetus, the Legislature would have said so;

4. Conspicuously missing from the definition of "person" as set forth in the wrongful death statute is the word "fetus";

5. The wrongful death statute is in derogation of common law and thus must be strictly construed with the words given a narrow construction. *Carolina Freight Carriers Corp. v. Keane,* 311 Md. 335, 534 A.2d 1337 (1988);

6. Using a strict construction of the statute, the word "person" as used in the statute does not include a fetus;

7. McClamb, Sr., did not "openly and notoriously recognize" any *person* as his child because McClamb, Jr., was not a "person" at any time prior to McClamb, Sr.'s death.

We agree with the arguments of the appellees, as did the trial judge. We find particularly persuasive the fact that the wrongful death statute must be narrowly and strictly construed.

 It is obvious that section 3–904(h) had two main purposes. First, to allow, under certain circumstances, an

illegitimate child to recover for his/her father's wrongful death and, second, to safeguard against false claims of parenthood. There is a logical reason to distinguish between acknowledgment of parenthood of a fetus as opposed to acknowledgment of a living child. Until the child is born, a father has no way of informally judging the odds of his parenthood by ascertaining whether the newborn bears any familial resemblance or whether he and the child possess any common traits such as matching eye and hair color or similar facial features.

In its opposition to the motion for summary judgment and in their brief, appellants never directly discuss appellees' argument that section 3–904(h)(2)(i) requires that the putative father acknowledge himself to be the father of a *person* and that McClamb, Jr., did not exist as a *person* at any time during McClamb, Sr.'s life. Instead, they stress the obvious—that McClamb, Jr., was a person when the wrongful death action was filed.

Appellants rely on *Lopez v. Maryland State Highway Admin.*, 327 Md. 486, 610 A.2d 778 (1992). In *Lopez*, German Rodriguez was killed in an accident while riding in a vehicle with his girlfriend, Helen Lopez. *Id.* at 488, 610 A.2d 778. Ms. Lopez was pregnant with Rodriguez's baby at the time of the accident—and she gave birth to his child eight months post-accident. *Id.* Two weeks after the child was born, Ms. Lopez, on behalf of her child, filed a claim with the Maryland State Treasurer asserting that the State Highway Administration ("SHA") breached a duty owed to Rodriquez and caused his death. *Id.* As the *Lopez* Court explained:

> In order to pursue this claim against the State, Lopez had to first comply with the provisions of the Maryland Tort Claims Act (MTCA), Md.Code (1984, 1991 Cum.Supp.), State Government Art., §§ 12–101 *et seq.* When the legislature passed the MTCA and abrogated the State's sovereign immunity, it imposed certain procedural requirements that must be met in order to maintain a common law or statutory tort claim against the State. Section 12–106(b) embodies a condition precedent to such an action: "A claimant may not institute an action under this subtitle unless ... the claim-

ant submits a written claim to the Treasurer or a designee of the Treasurer within 180 days after the injury to person or property that is the basis of the claim."

The Lopez claim was filed with the Treasurer on March 16, 1989—16 days after his birth and 286 days after the death of his father. In a letter dated September 1, 1989, the State Treasurer denied his claim stating that she believed "that the State was not at fault" in his father's death. Approximately six months later, Lopez filed a wrongful death action in the Circuit Court for Prince George's County naming the Maryland State Highway Administration as a defendant. The State countered with a motion for summary judgment arguing that Lopez had failed to file his claim with the Treasurer within 180 days of his father's death and, therefore, he did not satisfy the § 12–106(b) condition precedent to bringing the action. Judge Joseph S. Casula felt constrained to accept the State's contention and granted its motion for summary judgment, although he recognized that this interpretation was "harsh" and acknowledged that he would be "very happy to be reversed" on appeal.

*Lopez,* 327 Md. at 489, 610 A.2d 778 (footnote omitted).

The question presented in *Lopez* was narrow, viz: Did the minor plaintiff's injuries arise at the time of his father's death or at the time of the child's birth? *Id.* at 489–90, 610 A.2d 778. The SHA argued that the wrongful death claim of the minor plaintiff arose on the date of Rodriguez's death—and since notice had not been given to the Treasurer within six months of that date, the minor plaintiff's claim should be barred. The Court held that his injuries occurred at the time of the child's birth and thus his notice to the Treasurer was timely. *Id.* at 494, 610 A.2d 778. In so ruling, the Court mentioned, in passing, that the determination of paternity, pursuant to section 3–904(h) of the Courts and Judicial Proceedings Article of the Maryland Code, had nothing to do with the issue of what loss or injury the child will suffer at his or her birth. *Id.* at 493, 610 A.2d 778.

Appellees argue:

Although *Lopez* addressed the 180–day provision to file a claim with the Maryland State Treasurer pursuant to MTCA [Maryland Tort Claims Act], the Court of Appeals does not then deny Lopez' right to bring his action under the Wrongful Death Statute once the initial MTCA procedures are satisfied. To the contrary, the Court of Appeals cites the identical Wrongful Death statutory provision at issue in this case, § 3–904(h). Lopez, the Court of Appeals holds, would have to prove pursuant to the wrongful death statute that he is the son of his father, since his parents were unmarried. *Id.* at 491, 610 A.2d 778. The court did not deny his right to maintain a wrongful death action although he was not a viable fetus at the time of his father's death. Viability was irrelevant because Lopez was born alive.

While it is true that the *Lopez* Court did not deny the minor plaintiff a right to bring a wrongful death claim, it is equally true that no one argued that the putative father had never acknowledged paternity of the minor plaintiff. *Lopez,* therefore, is inapposite.[7]

### E. Conclusion

The rulings of the trial court concerning the inapplicability of the doctrine of *res ipsa loquitur,* the rejection of appellants' punitive damage claim, and the rejection of the minor plaintiff's wrongful death claim are affirmed. The court's grant of summary judgment in favor of the appellees as to liability is reversed.

**JUDGMENT AFFIRMED IN PART AND REVERSED IN PART;COSTS TO BE PAID 50 PERCENT BY APPELLANTS AND 50 PERCENT BY APPELLEES.**

---

**7.** Appellants filed a motion to correct the record; Heitkamp consented to the motion, but the WSSC and Jaci failed to respond. The motion is granted for the reasons set forth by appellants in their motion.

Heitkamp filed a motion to dismiss the appeal based on appellants' violations of many of the rules governing appeals to this Court. While there were indeed numerous rule violations by appellants, none of them prejudiced appellees. Because no prejudice was shown, we shall deny the dismissal motion.