957 A.2d 654

**Rodney Edward BROWN**

v.

**STATE of Maryland.**

**No. 945, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Oct. 2, 2008.

142

Philip T. Inglima, Jasmine H. Yoon (Crowell & Moring, LLP on the brief), Washington, D.C., for appellant.

James Williams (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Argued before DAVIS, HOLLANDER and EYLER, JAMES R., JJ.

HOLLANDER, J.

On the night of June 18, 2005, Jermaine Hardy and Tory Burnett were in the home of Burnett's mother when one or more assailants burst into the home and began shooting at them. Burnett was killed, but Hardy survived. Following a trial in April of 2006, a jury in the Circuit Court for Baltimore City convicted Rodney Edward Brown, appellant, of first-degree and second-degree assault on Hardy. *See* Md.Code (2002, 2007 Supp.), §§ 3–202 & 3–203 of the Criminal Law Article ("C.L."). In addition, the jury convicted appellant of use of a handgun in the commission of a felony or crime of violence, *see* C.L. § 4–204, as well as wearing, carrying, or transporting a handgun. *See* C.L. § 4–203. However, Brown was acquitted of the murder of Burnett and the attempted murder of Hardy. The court sentenced appellant to a total term of imprisonment of 45 years.[1]

On appeal, Brown poses three questions, which we quote:

I. Was the evidence sufficient to prove that the weapon used in the shooting of Mr. Hardy was a "handgun," as that term is defined in § 4–201 of the Criminal Law Article?

II. Was the evidence sufficient to prove that Mr. Hardy suffered serious physical injury, as that term is defined in § 3–201 of the Criminal Law Article?

III. Was the evidence sufficient to support the Appellant's conviction given the controverted and recanted identification testimony?

For the reasons that follow, we shall reverse the handgun convictions and affirm the assault convictions.

---

1. In particular, appellant was sentenced to twenty-five years' imprisonment for first-degree assault, and to a consecutive sentence of twenty years for the use of the handgun conviction. *See* C.L. § 4–204(b). The remaining convictions were merged for sentencing.

## I. FACTUAL AND PROCEDURAL SUMMARY

On the night of June 18, 2005, Tory Burnett was killed in a hail of gunfire. His friend, Jermaine Hardy, was injured.

Dr. Karin Sands, a fellow in forensic pathology with the Office of the Chief Medical Examiner, testified that Burnett was shot three times, one of which "injured abdominal organs like the pancreas and the intestines as well as blood vessels in the pelvis." She explained that only one bullet was recovered from the victim's body; it was found in the abdomen. Burnett's other two injuries—to the knee and to the forearm—were "through and through," meaning that the bullets "exited" the body. Dr. Sands opined that Burnett died as a result of multiple gunshot wounds, and the manner of death was homicide.[2]

Hardy testified that, as he and Burnett were sitting in the kitchen of Burnett's home on the evening of June 18, 2005, the back door "came flying open" and "a dark skinned guy he was like the first one, he came in or whatever and he said you all know what it is, and I turn[ed] to run...."[3] Hardy recalled that "[s]ome shots started ringing off ... maybe two or more," an d he retreated to the basement of the house, where he had previously seen a gun. Hardy stated: "I ran down there. At first I was going to hide and then I remembered there was a gun in the basement so I looked for it and I found the gun under the cushion and just waited right there by the side of the steps."[4]

---

**2.** Dr. Sands observed that Burnett would not have died "immediately" from the injuries; rather, it "would take minutes," based on the volume of blood loss.

**3.** The application for statement of charges was referred to at trial as "Defense Exhibit One," but was not actually entered into evidence. It indicates that the assailant who entered first was "armed with two handguns." The investigating detective testified that he was told by Hardy that the assailant entered shooting "two guns." However, as we shall discuss, *infra*, Hardy did not testify as to what kind of weapons the assailant was holding.

**4.** As we discuss, *infra*, Hardy was not able to identify precisely the type of gun he found, nor was the gun placed in evidence.

According to Hardy, one of the assailants pursued him into the basement. Hardy said: "As he started coming down the steps I started shooting." Hardy claimed that he fired "[p]robably about four or five [shots], something like that" at his assailant. But, when asked whether he actually shot the intruder during the altercation, Hardy responded: "I don't know. I can't really say." Hardy indicated that the assailant did not continue down the stairs; "[t]hey shot back [at Hardy] a couple of times and they ran back up." Hardy never saw the face of his assailant, explaining that he saw "[j]ust his legs."

After the intruder ascended the stairs, Hardy said he heard a voice say "come on, let's go." Hardy returned upstairs and saw the back of a "tall, slim" man leaving through the rear door. He also found Burnett lying mortally wounded on the dining room floor. Hardy secured the back door and then exited from the front door to retrieve the truck he was using. While he attempted to help Burnett into the truck, Burnett collapsed. As Hardy attempted to give Burnett mouth-to-mouth resuscitation, he heard noises at the back door. Hardy recalled: "[W]hen I heard that noise I just—my instinct was to run. So I took and ran towards the front door and some more gunshots rang off and I heard some glass break over top of my head." Hardy ran a few blocks to North Avenue, where he flagged down a hack and had the driver drop him off at a vacant house in the Waverly neighborhood, where he had previously lived; he stayed there until dawn. Hardy did not testify as to whether he was injured during the attack.

Through his attorney, Hardy contacted the State's Attorney's office four days after the incident. Hardy testified that he had been afraid to come forward for fear that he might be criminally charged for his own use of a firearm and his flight from the scene. Accompanied by his attorney, Hardy met with police and gave an oral statement, which was not recorded. Nor did he sign a statement. Several days later, on June 29, 2005, Hardy met with Baltimore City Police Detective Robert Dohony, without counsel. The meeting began with an unrecorded "pre-interview," which was followed by a tape-

recorded interview. During the "pre-interview," Dohony showed Hardy a photographic array consisting of six photographs, including one of appellant. The following exchange is relevant:

[DEFENSE COUNSEL]: Now during this meeting you discussed the shooting with the detective, didn't you?

[HARDY]: Right.

[DEFENSE COUNSEL]: And you were telling him what you saw, what occurred?

[HARDY]: Right.

\* \* \*

[DEFENSE COUNSEL]: Okay, and he showed you a photo array, didn't he?

[HARDY]: Right.

[DEFENSE COUNSEL]: And did he ask you any questions regarding that photo array?

\* \* \*

[HARDY]: Yeah, he just asked me if any of them looked familiar to me or whatever.

[DEFENSE COUNSEL]: Did there come a time that the detective asked you to pick someone out?

[HARDY]: Yes.

[DEFENSE COUNSEL]: And how did he go about doing that?

\* \* \*

[HARDY]: Okay, while I was there he asked me if anybody—did any of them look familiar. I told him no except for this one guy that was my friend.[5] So it was a couple of moments of silence and he said what about this guy right

---

5. Hardy explained that a picture of an acquaintance, who was unconnected to the case, was coincidentally included in the lineup, at position three (top right).

here. He said not even this guy right here. He said with the description you gave me—

[DEFENSE COUNSEL]: Which one was he pointing to?

[HARDY]: To what's his name Rodney, yes.

\* \* \*

[DEFENSE COUNSEL]: And that's a picture of Mr. Brown?

[HARDY]: Yes.

[DEFENSE COUNSEL]: And show us how he was telling that, what was he doing?

[HARDY]: He was sitting beside me and I was looking at the pictures just like this. I told him I recognized the one guy. I said yeah none of these don't look like they could be the guy. So he said what about this guy right here. He said you sure because he's been shot. Then that's how I found out that Rodney got shot.

[DEFENSE COUNSEL]: Did you ever see Rodney before?

[HARDY]: No.

[DEFENSE COUNSEL]: Hear his name?

[HARDY]: No. . . . I never saw him before in my life.

Hardy testified that he then "rode with it. I said he do look kind of familiar with the description that I gave you. [The detective] told me it was a DNA case so I knew this guy wasn't going to get convicted." Hardy testified that he signed his name above the photograph of appellant.

According to Hardy, during the taped interview that followed, the police asked him "if they pointed out anybody in the lineup." He explained: "I said no because I wasn't going to sit there in their house and tell the Homicide detectives that yes you made me point him out right in their face. I was scared to do that." Over defense objection, the signed photo array was admitted into evidence .[6]

---

6. Prior to trial, appellant unsuccessfully moved to suppress the photo array on the ground that impermissible suggestiveness tainted Hardy's

At trial, however, Hardy repudiated his pre-trial identification of appellant. The following colloquy is relevant:

[DEFENSE COUNSEL]: [D]id there come a time you spoke to a member of my office?

\* \* \*

[HARDY]: Yes.

[DEFENSE COUNSEL]: Why did you make that call?

[HARDY]: Because I knew that [appellant] didn't do it so I wanted to let you know—I wanted to try to get in touch with his attorneys or whoever was representing him to let them know that I'm ready to come forward and let them know that he didn't do it, that he didn't do it.

---

identification. Hardy and Dohony both testified at the motion hearing; their testimony was consistent with their subsequent trial testimony. The motion court also heard the tape recorded police interview of Hardy, although Hardy's recorded statement was not played for the jury at trial.

On appeal, appellant does not challenge the denial of his suppression motion. Although the record transmitted to this Court does not contain all of the exhibits admitted at trial, it does include Hardy's recorded pre-trial statement to the police. As a matter of interest, we quote from an exchange during that interview, presented to the motion court:

DOHONY: [W]ho is that individual [whose photo you signed]?

HARDY: I don't know him by name but he looks like he could be one of the suspects that came into the house during the robbery.

DOHONY: Is that the suspect that you described to me as the person that came down the basement after you?

HARDY: It could be because the bottom portion of his face looked very familiar.

DOHONY: Okay once you looked at the photo lineup about how long did you look at it do you remember?

HARDY: A couple of minutes I guess.

DOHONY: Would you say it was less than a minute?

HARDY: Yeah probably less than a minute.

DOHONY: Okay and during that time when you were looking at the lineup did myself or Detective Baier force you to look at this lineup?

HARDY: No.

DOHONY: Did we point at any photos?

HARDY: No.

DOHONY: Detective Baier do you have any questions?

BAIER: Did we assist you in any way at all with picking out that photograph?

HARDY: No.

[DEFENSE COUNSEL]: Did anyone from my office come to you first to tell you to call us?

[HARDY]: No.

[DEFENSE COUNSEL]: You did that all by yourself?

[HARDY]: Did that by myself.

[DEFENSE COUNSEL]: Now, in the taped interview that you gave to the detective ... do you recall using the words it looks like?

[HARDY]: Yeah, I could have used it, yeah.

[DEFENSE COUNSEL]: Do you remember using words most likely?

[HARDY]: I don't remember using most likely.

[DEFENSE COUNSEL]: Did you ever, ever say that's him?

[HARDY]: No.

[DEFENSE COUNSEL]: That's the man who shot me?

[HARDY]: No.

[DEFENSE COUNSEL]: That's the man who killed my friend?

[HARDY]: No.

[DEFENSE COUNSEL]: Here today standing here looking at that man, is that the man you saw—

[HARDY]: No.

[DEFENSE COUNSEL]:—in the house?

[HARDY]: That's not him.

[DEFENSE COUNSEL]: Is that the man who shot your friend?

[HARDY]: That's not him.

[DEFENSE COUNSEL]: Is that the man who shot you?

[HARDY]: That's not him.

[DEFENSE COUNSEL]: Has anyone threatened you to say that?

[HARDY]: No.

[DEFENSE COUNSEL]: Has anyone contacted you to say that?

[HARDY]: No.

[DEFENSE COUNSEL]: Has anyone paid you to say that?

[HARDY]: No, I wish.

Detective Dohony acknowledged that Hardy's photo line-up identification had been made prior to the taped interview. He testified that the purpose of conducting an unrecorded "pre-interview" is to "make sure that [interview subjects] know what's happening, that they're comfortable in the office, make sure that we're both on the same page, that the facts are straight, and they fully understand why they're down there. It's just a general conversation." According to Dohony, during the pre-interview he showed Hardy the photo array and asked him to identify any photos that depicted the intruders. Detective Dohony claimed that Hardy selected appellant's photo in six seconds, without prompting. The following testimony is relevant:

[PROSECUTOR]: In either the first or your second discussion with Mr. Hardy did you ever tell Mr. Hardy to identify anyone as the perpetrator of this crime?

[DOHONY]: No.

[PROSECUTOR]: Did you ever point at one of those six photographs and tell him just pick one?

[DOHONY]: No.

[PROSECUTOR]: Pick that one?

[DOHONY]: No.

[PROSECUTOR]: Did you ever offer him some money to pick someone out?

[DOHONY]: No.

[PROSECUTOR]: Let's talk about the actual showing Mr. Hardy of that photographic lineup. Step-by-step how did that occur?

[DOHONY]: After, you know, he knows that he's there to see a photo lineup. I have the photo lineup with me. We're sitting in an interview room at a table together. There's a

paragraph that I read to him prior to showing him the photo lineup.

[PROSECUTOR]: Read that to the ladies and gentlemen.

[DOHONY]: This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hairstyles, beards and mustaches can be easily changed. Also photographs may not always depict the true complexion of a person. The complexion may be lighter or darker than shown in the photo. When you've looked at all of the photos tell me whether or not you see the person who committed the crime. Do not tell any other witnesses that you have or have not identified anyone.

\* \* \*

[PROSECUTOR]: How long does it take for [Hardy] to say anything about what he's looking at?

[DOHONY]: He identified on this. In six seconds he identified the picture [of appellant].

[PROSECUTOR]: All right, the picture of—which picture is this, one through six?

[DOHONY]: It would be number six.

[PROSECUTOR]: And is that the picture of the suspect you may have developed?

[DOHONY]: Yes.

Detective Dohony was called to the scene of Burnett's house at about 12:40 a.m. on June 19, 2005. He found numerous shell casings and live rounds, and saw blood inside and outside of the house.

Dohony testified that Hardy's truck was recovered at the scene, and the police traced it to the owner, Shaneka Brooks, who is the mother of Hardy's daughter. Ms. Brooks told Dohony "about her boyfriend [i.e., Hardy] who contacted her and said that he was also shot during this incident." Moreover, Dohony testified that Hardy told him that he had been shot in the upper thigh during the incident. Dohony also

identified a photograph, State's Exhibit No. 14, as a picture of Hardy's right leg taken four days after the attack, when Hardy was first interviewed by the police. Over defense objection, Dohony stated that the photograph depicted a bullet wound. Dohony also identified several other crime scene photographs, including two depicting blood in Ms. Brooks's truck, on the driver's seat (State's Exhibit No. 12), and on the inside of the driver's side door (State's Exhibit No. 13).[7]

Detective Dohony suspected that one of the assailants might have been injured. Accordingly, he notified other officers to check area hospitals for incoming gunshot victims.

Officer Maurice Avance testified that on the night of the attack, he responded to the emergency room at the University of Maryland Hospital to interview a person who had presented with a gunshot wound to the foot. The wounded person was identified as appellant. Officer Avance personally observed appellant's wound, and described it in his notes as a "small gunshot wound." Officer Avance had employees of the police crime lab take pictures of appellant's injuries, which were introduced in evidence. Avance also advised police dispatch that he had a shooting victim at the hospital.

According to Officer Avance, appellant identified himself at the hospital as "Donte Brown." "Donte Brown" told Officer Avance that he had been dropped off at the hospital by his brother, "Rodney Brown." Appellant claimed that from about 10:30 p.m. until 2 a.m. he was with two friends at a bar called Maccio's. Brown recounted to Avance that, as he was leaving the bar, he witnessed someone being held up at gunpoint, and during this robbery the gunman confronted appellant and shot

---

7. We note that a DNA Laboratory Report, State's Exhibit No. 32–A, indicated that swabs were tested from the "center console," "driver's side door (int.)," and "car seat." Because a reference sample of Hardy's DNA was not taken, however, none of these samples could be determined to originate from Hardy. The driver's side door sample was consistent with Burnett's DNA, and the center console sample was consistent with a mixture of DNA from Burnett and an "unknown source." The car seat sample yielded a DNA profile from "an unknown male (Unknown Male No. 1)."

him in the foot. Brown, who had only one shoe, told Avance that his missing shoe had been left at the scene of the alleged robbery.

Avance told Brown to remain at the hospital for further questioning. Brown was supposed to undergo an X-ray examination, according to Avance. However, appellant left the hospital when Avance was out of the room, before he had the X-ray.

Detective Daniel Nicholson was assigned to investigate the shooting that was reported by appellant. He testified that the area of the alleged shooting as reported by appellant was canvassed, but no physical evidence was found that indicated that a shooting had taken place. Nor were there any reports of a shooting. The police were also unable to locate appellant's shoe. Further, he determined that there was no "Donte Brown" who lived at the address given to Officer Avance by appellant. But, he determined that a "Rodney Brown" lived at a nearby address.

Appellant was arrested on July 14, 2005, in connection with the shootings of Burnett and Hardy. He gave a tape recorded statement to the police, which was played for the jury, in which he repeated the essentials of the story he had told Avance while at the hospital. He denied any culpability in the attack on Burnett and Hardy.

James Wagster, an expert in "firearms examination," testified regarding the analysis of the ballistics evidence recovered from the scene. He analyzed the one bullet that was recovered from Burnett's body, as well as several bullets, bullet fragments, cartridge cases, and live cartridges that were recovered from the scene.[8] In all, he found "three different caliber, either cartridges or bullets...." In particular, Wagster noted that the calibers were 7.62 × 39 cartridge cases, which are "most common[ly]" used in rifles but also in some handguns; .45 caliber bullets, which are "mostly" used in handguns but can also be used in "some carbines"; and .41

8. Wagster's report was entered into evidence as State's Exhibit No. 31.

caliber bullets, which, to his knowledge, are only used in handguns. Wagster described a .44 caliber handgun as "a very large caliber gun" and "one of the more powerful handguns . . . ." He acknowledged that a .45 is not as "powerful" as a .44. Nevertheless, a .45 caliber bullet is "a large diameter bullet," and he agreed that either a .44 or .45 caliber bullet "would do a lot of damage" if it hit a person.

Wagster concluded that at least three weapons had been involved. However, because no weapons were recovered, including the weapon used by Hardy, no weapons could be matched to the ballistics evidence.

The State called Rana Santos as an expert in DNA analysis. She stated that appellant could not be identified as the source of any of the thirteen items of DNA evidence recovered from the scene. Santos testified, however, that appellant could not be "excluded" as a possible contributor to a tissue swab from sunglasses found at the scene, which contained the mixed DNA of at least three unidentified individuals. She also testified that neither the decedent (Burnett) nor appellant could be excluded "as possible contributors to this mixture." Further, she stated that such an inconclusive test result did not establish that the tissue found on the pair of mirrored sunglasses was Brown's. Thus, the State did not produce any DNA evidence linking Brown to the crime scene.

At the close of the State's evidence, appellant moved for acquittal on the grounds of insufficiency of evidence. The trial court denied his motion.

Antonio Mitchell, a neighbor of Burnett, was the sole witness for the defense. He testified that he informed police who were canvassing for witnesses that he saw three or four men with slim builds running out of a house on Holbrook Street, but he did not see them carrying weapons. After Mitchell's memory was refreshed by reading the notes of the police officer who had interviewed him, he testified that one of the men had walked "maybe . . . a little slower. . . . Could have been injured but I'm not sure."

At the close of the defense case, appellant renewed his motion for acquittal. The court again denied the motion. Thereafter, the jury acquitted appellant of all charges relating to Tory Burnett's murder, and of the attempted murder of Hardy, but convicted him of first-degree and second-degree assault of Hardy, as well as two handgun charges.[9]

We shall include additional facts in our discussion of the issues.

## II. DISCUSSION

### A.

Appellant asserts three grounds for the reversal of his convictions, all of which are challenges to the sufficiency of the evidence. He asserts that the evidence was insufficient to show: (1) that Hardy was attacked with a "handgun"; (2) that Hardy suffered a "serious physical injury"; and (3) that appellant could be identified as the perpetrator of the assault on Hardy.[10] Before addressing these contentions, we pause to

---

9. At one point during the jury deliberations, the jury sent a note to the court, stating "hung jury." The court contemplated giving the jury an *Allen* charge. *See Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); *see also Ruffin v. State*, 394 Md. 355, 359 n. 2, 906 A.2d 360 (2006) ("The instruction is intended to stress to jurors the necessity of unanimity in their decision, as well as to encourage a juror to listen to the viewpoints of the other jurors."). However, the court declined to do so, on the advice of both the prosecutor and defense counsel, and merely admonished the jury to "continue your deliberations," because "you, myself, and the lawyers, certainly the defendant, have invested substantial time in this case." Later that afternoon, the jury returned its verdict.

10. Appellant does not complain on appeal that the verdicts were inconsistent. We note that in the recent case of *Price v. State*, 405 Md. 10, 949 A.2d 619 (2008), the Court held that inconsistent jury verdicts in a criminal trial are impermissible. *Id.* at 18–29, 949 A.2d 619. The *Price* Court limited the effect of its holding, however, to "similarly situated cases on direct appeal *where the issue was preserved,* and verdicts in criminal jury trials rendered after the date of our opinion...." *Id.* at 29, 949 A.2d 619 (emphasis added). Moreover, Judge Harrell, joined by Judge Battaglia, wrote separately "to note explicitly that the Majority's holding applies only to 'legally inconsistent' verdicts, not 'factually inconsistent' verdicts." *Id.* at 35, 949 A.2d 619 (Harrell, J., concur-

consider the standard of review in a challenge to the sufficiency of the evidence.

In reviewing a claim of legal insufficiency, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see Rivers v. State*, 393 Md. 569, 580, 903 A.2d 908 (2006); *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821 (2002); *White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001); *State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336 (1994). We give due regard to the jury's finding of facts and its responsibility to weigh and resolve conflicting evidence, draw reasonable inferences from the evidence, and determine witness credibility. *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *Moye*, 369 Md. at 12, 796 A.2d 821; *McDonald v. State*, 347 Md. 452, 474, 701 A.2d 675 (1997), *cert. denied*, 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998); *Dawson v. State*, 329 Md. 275, 281, 619 A.2d 111 (1993). Moreover, appellate review of the sufficiency of evidence should not involve undertaking "a review of the record that would amount to a retrial of the case." *Winder v. State*, 362 Md. 275, 325, 765 A.2d 97 (2001).

" 'Circumstantial evidence is as persuasive as direct evidence.' " *Mangum v. State*, 342 Md. 392, 400, 676 A.2d 80 (1996) (citation omitted); *see also Hebron v. State*, 331 Md. 219, 226, 627 A.2d 1029 (1993); *Handy v. State*, 175 Md.App. 538, 562, 930 A.2d 1111, *cert. denied*, 402 Md. 353, 936 A.2d 851 (2007); *Wagner v. State*, 160 Md.App. 531, 560 n. 22, 864 A.2d 1037 (2005); *Allen v. State*, 158 Md.App. 194, 249, 857 A.2d 101 (2004), *aff'd*, 387 Md. 389, 875 A.2d 724 (2005); *Hagez v. State*, 110 Md.App. 194, 204, 676 A.2d 992 (1996). Indeed,

---

ring). "A factually inconsistent verdict is one where a jury renders 'different verdicts on crimes with distinct elements when there was only one set of proof at a given trial, which makes the verdict illogical,' " while a "legal inconsistency, by contrast, occurs when 'an acquittal on one charge is conclusive as to an element which is necessary to and inherent in a charge on which a conviction has occurred....' " *Id.* at 35, 37, 949 A.2d 619 (citations omitted).

"circumstantial evidence ... is 'sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused.'" *Painter v. State,* 157 Md.App. 1, 11, 848 A.2d 692 (2004) (citation omitted); *accord Wilson v. State,* 319 Md. 530, 536–37, 573 A.2d 831 (1990); *Veney v. State,* 251 Md. 182, 201, 246 A.2d 568 (1968), *cert. denied,* 394 U.S. 948, 89 S.Ct. 1284, 22 L.Ed.2d 482 (1969); *Hall v. State,* 119 Md.App. 377, 393, 705 A.2d 50 (1998).

▇ However, as with direct evidence, circumstantial evidence is only sufficient " 'if the circumstances, taken together, do not require the trier of fact to resort to speculation or conjecture....'" *State v. Pagotto,* 361 Md. 528, 564, 762 A.2d 97 (2000) (quoting *Taylor v. State,* 346 Md. 452, 458, 697 A.2d 462 (1997)). Thus, " 'evidence which merely arouses suspicion or leaves room for conjecture is obviously insufficient. It must do more than raise the possibility of guilt or even the probability of guilt. [I]t must ... afford the basis for an inference of guilt beyond a reasonable doubt.'" *Pagotto,* 361 Md. at 564, 762 A.2d 97 (citations omitted); *see State v. Suddith,* 379 Md. 425, 446, 842 A.2d 716 (2004) (recognizing that jury has "the duty of resolving factual disputes" and of making "reasonable inferences").

### B.

Appellant contends that both of his handgun convictions must be reversed because the evidence is insufficient to prove that the assault on Hardy was committed with a "handgun," as that term is statutorily defined.

C.L. § 4–201(c) defines a "handgun" as follows:

(1) "Handgun" means a pistol, revolver, or other firearm capable of being concealed on the person.

(2) "Handgun" includes a short-barreled shotgun and a short-barreled rifle.

(3) "Handgun" does not include a shotgun, rifle, or antique firearm.

The definition found in C.L. § 4–201(c) is relevant both to C.L. § 4–204(a), which provides that "[a] person may not use an antique firearm capable of being concealed on the person or any handgun in the commission of a crime of violence . . . or any felony," and to C.L. § 4–203(a), which provides that "a person may not . . . wear, carry, or transport a handgun, whether concealed or open, on or about the person. . . ." Moreover, under C.L. § 4–201(f)–(g), rifles and shotguns shorter than 26 inches are "short-barreled."

We pause to review additional evidence adduced at trial. Hardy provided the following testimony describing the weapons used by his assailants:

[PROSECUTOR]: When these individuals did kick in the doors and start shooting, could you describe their weapons at all?

[HARDY]: No.

[PROSECUTOR]: Could you at least say if they were pistols or rifles or what have you?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

[HARDY]: I can say that they found an AKA 47[sic] shell on the floor.

[DEFENSE COUNSEL]: Objection as to they.

[PROSECUTOR]: I'll withdraw it.

Asked to describe the gun he used, Hardy stated: "I think it was a .44 revolver or a .45 revolver. I ain't really sure. . . . I think it might have been a .44 or .45." The following exchanges are also pertinent:

[PROSECUTOR]: [W]as it an automatic?

[HARDY]: A revolver.

[PROSECUTOR]: A revolver. And what does that mean to you, that it was a revolver?

\* \* \*

[HARDY]: It's not an automatic gun. It's a revolver.

[PROSECUTOR]: And you have to put each bullet in?

[HARDY]: Right.

* * *

[PROSECUTOR]: What does the—what does the bullet do after the gun is fired?

[HARDY]: It ejects out.

* * *

[PROSECUTOR]: And so that was—was that happening with the gun you were using?

[HARDY]: No.

* * *

[DEFENSE COUNSEL]: When you were firing do you have any experience with firearms?

[HARDY]: No.

[DEFENSE COUNSEL]: In fact, you couldn't even tell the difference between a .44 and a .45, right?

[HARDY]: Correct.

As noted, the State presented the testimony of James Wagster, a firearms expert, regarding the analysis of the ballistics evidence recovered from the scene. Wagster analyzed one bullet that was recovered from Burnett's body and five bullets, a bullet fragment, a lead fragment, six fired cartridge cases, and two live cartridges that were recovered from the scene. He concluded that the ammunition was of three different calibers, and therefore that at least three weapons had been used.

The bullet recovered from Burnett's body and one of the cartridge cases recovered from the scene (exact location unspecified) were caliber ".45 AUTO." Additionally, Wagster's report, which was introduced in evidence, stated that the bullet recovered from Burnett's body and the bullet fragment recovered from the basement sink "bear similar rifling class characteristics however no positive identification or elimination could be made due to mutilation of [the bullet fragment]."

The other five cartridge cases and one of the live cartridges recovered from the scene (exact locations unspecified) were caliber "7.62 × 39mm (M43)." According to the report, the live cartridge had "a firing pin strike on the primer. This could not be identified or eliminated to any of the firing pin marks on [the five cartridge cases of the same caliber]." The remaining live cartridge recovered from the scene (exact location unspecified) was caliber ".41 REM MAG." Wagster's report indicated that three of the bullets, which were recovered from the "basement steps," "under basement steps," and the "dining room floor," "are lead bullets of approximately .41 caliber that could not be identified or eliminated as having been fired with the same unknown firearm. . . . [The three bullets] are of no value for comparison due to surface damage on these bullets." The remaining two bullets, recovered from the "front sidewalk" and the "living room floor," were "undetermined caliber bullets that could not be identified or eliminated as having been fired with the same unknown firearm." [11]

The following portions of Wagster's testimony are relevant:

[PROSECUTOR]: All right, now, could a[.]45 caliber bullet be fired from a 7.62[x] 39[mm]?

[WAGSTER]: No, sir.

[PROSECUTOR]: Could any of these been [sic] fired from a different weapon other than what the caliber it was [sic]?

[WAGSTER]: None of these are interchangeable.

[PROSECUTOR]: All right, starting with the 7.62[x] 39[mm] what type of weapon fires that bullet?

[WAGSTER]: Most common are rifles.[12]

[PROSECUTOR]: Can anything else fire it?

[WAG STER]: There's a couple of handguns that chambered are 7.62 by 39.

---

11. The lead fragment, which was recovered from the "kitchen floor," was not discussed in Wagster's report or in his testimony.

12. Wagster never indicated that the type of rifle included a short-barreled rifle, within the meaning of C.L. § 4–201(c)(2).

[PROSECUTOR]: The same question with the [.]45?

[WAGSTER]: There again there's mostly handguns, but there are some carbines that are chambered for that.

[PROSECUTOR]: And finally the [.]41?

[WAGSTER]: The [.]41, as far as I know, is just a handgun round.

\* \* \*

[DEFENSE COUNSEL]: In fact, you never recovered any gun for comparison sakes, did you?

[WAGSTER]: None were submitted, no, sir.

\* \* \*

[DEFENSE COUNSEL]: And to your knowledge as an expert in the field of firearms are there any 45 caliber revolvers on the market in the Untied States?

[WAGSTER]: Yes, sir. . . . Smith and Wesson made a bunch of them years ago. I'm not sure if they're still making them or not.

\* \* \*

[DEFENSE COUNSEL]: But primarily it's an automatic handgun or semi-automatic?

[WAGSTER]: A semi-automatic, yes, sir.

[DEFENSE COUNSEL]: Now, a 44 caliber, okay, some of those were made in semi-automatic too, correct?

[WAGSTER]: Yes, sir.

[DEFENSE COUNSEL]: But very few, correct?

[WAGSTER]: Correct.

[DEFENSE COUNSEL]: And they're mainly revolvers, correct?

[WAGSTER]: Mainly, yes, sir.

\* \* \*

[DEFENSE COUNSEL]: You examined the 45 casings, right . . . ?

[WAGSTER]: I think there was one, yes, sir.

[DEFENSE COUNSEL]: And did it have extraction marks on it?

[WAGSTER]: I didn't look for that.

[DEFENSE COUNSEL]: Why not?

[WAGSTER]: Without the gun, we don't use those to say it's fired in a firearm so unless we have the gun and you have the live ammunition or something you're trying to match to a gun or ammunition in somebody's pocket, but generally we don't.

[DEFENSE COUNSEL]: For the jury to know what is an extraction, what is an extraction?

[WAGSTER]: On semi-automatics whether it's a rifle or a semi-automatic pistol when the cartridge case is fired when the slide comes back, there's a hook called an extractor that grabs hold of the lip of or the rim of the cartridge, pulls it out of the gun, and then there's another piece of metal called an ejecter that it hits and that's what flips the cartridge case out of the firearm.

\* \* \*

[DEFENSE COUNSEL]: Well, in this case you didn't look to see if there were any extraction marks at all?

[WAGSTER]: As a rule we don't put them in.

Appellant argues that the State failed to prove "that the gun used in this instant case could not have been a shotgun, rifle, or antique firearm [incapable of being concealed on the person]—the statutory exceptions to the definition of a 'handgun.' " Noting that no weapons were recovered or produced at trial, including the weapon used by Hardy, appellant emphasizes that "Hardy testified that he could not describe the weapons used in the shooting at all. . . . " Moreover, he asserts that the State's own ballistics expert "suggested . . . that a rifle, not a handgun, could have been used in the shooting of Mr. Hardy." In this regard, appellant points out that Wagster testified that 7.62 × 39 caliber rounds are used most commonly in rifles and not handguns. Therefore, appellant argues that the ballistics

evidence could not allow the jury to conclude beyond a reasonable doubt that Hardy's assailant used a handgun, rather than a rifle.

Appellant cites *Beard v. State,* 47 Md.App. 410, 423 A.2d 275 (1980), and related cases, for the proposition that in order to convict appellant of the two handgun offenses the State had to prove beyond a reasonable doubt that the weapon used to shoot Hardy did not fall within the statutory exceptions to the definition of a "handgun." Claiming that the State failed in its proof, appellant reasons:

> Mr. Wagster testified that the bullets and casings found at the scene [included] 7.62 × 39 caliber bullets, used mainly in rifles.... No expert testimony was introduced as to what, if any, type of bullet allegedly hit Mr. Hardy. No medical record was introduced as to the size of Mr. Hardy's alleged gunshot wound. Even Mr. Hardy, the only eyewitness of the crime, could not identify or remember what kind of weapon was used to attack him.
>
> Despite the presence of multiple 7.62 × 39 caliber bullets and casings found at the scene, the State failed to introduce any evidence to refute the quite realistic possibility that a rifle was used to shoot at Mr. Hardy.

The State contends that the issue is not preserved for review. It points out that appellant made no argument in support of his motion for judgment of acquittal that the evidence was insufficient to prove that the weapon used was a "handgun."

At the conclusion of the State's case, the defense argued, in part:

> With regard to the weapons charge. We'll for the purpose of argument we'll concede that a handgun was used. *We'll concede that Mr. Burnett, only Mr. Burnett was shot with a handgun. However, we won't concede that it was Mr. Brown.* The reason why is there is no direct evidence linking or no evidence linking Mr. Brown to any weapon. *There is no gun.* There's no fingerprints. There's no

GSR [13] and there's no testimonial evidence that Mr. Brown was there or even the shooter. So the record is completely devoid of evidence with that count. (Emphasis added.) [14]

The following excerpts of the argument of counsel on appellant's motion for judgment are also relevant:

[DEFENSE COUNSEL]: The circumstantial evidence is not legally sufficient. *We have no handguns recovered.* We don't even have the handgun recovered that the victim allegedly shot [appellant] with. That defies imagination.

\* \* \*

So there is no evidence as to that, and again, that would be the same thing with the attempted robbery *and again with the wear, carry, and transport the same argument. No evidence—no evidence of recovery of a gun,* no evidence that Mr. Brown was the shooter. *The record is completely devoid of any evidence with regard to Mr. Brown that would be in there or using a gun.* (Emphasis added.)

\* \* \*

[PROSECUTOR]: All right, now, finally with the weapons charges counsel has conceded, of course, that a handgun was used. There is no reasonable debate on that. Obviously, counsel stated that it wasn't his client that used it, but again, based on the light most favorable to the State and all of the evidence from the stand and obviously particularly from Mr. Hardy, that handguns were used.

As indicated, appellant conceded that Burnett was shot by a handgun. However, he expressly denied agency and was, in fact, acquitted on the murder and gun charges in connection with Burnett. But, the issue is whether Hardy was shot with

---

**13.** GSR presumably refers to "gunshot residue."

**14.** According to the State, Brown's concession that the weapon used to kill Burnett was a handgun is further evidenced by his failure to "mention ... the State's purported lack of proof that the weapon was a 'handgun' " in his opening and closing arguments.

a handgun; appellant insists that no evidence linked him to a handgun in connection with the attack on Hardy. In this regard, Brown notes that he never conceded the use of a handgun in regard to the charges involving Hardy. We agree with appellant that he did not waive the contention that the State failed to prove the use of a handgun in the assault on Hardy.

Even if preserved, the State disputes appellant's contention, arguing that the evidence established that the weapon used in the shooting of Hardy was a handgun. It asserts:

[S]ince all three types of ammunition found at the crime scene could be fired from a handgun, there was sufficient evidence before the jury that Brown, found by the jury to be the criminal agent, used a handgun in perpetrating this crime.

Additionally, Wagster informed the jury that none of the bullets recovered at the scene were interchangable. In other words, a .45 caliber bullet could not be fired from a 7.62 by 39 calibrated weapon. According to Hardy's testimony, on the evening of the crime, he ran to the basement of the residence and retrieved a .44 or .45 caliber revolver. Hardy waited by the basement steps with the gun he found. Hardy told the jury that his assailant came part way down the basement steps, and he could only see the assailant's legs. At that moment, Hardy began shooting his weapon at the assailant. His assailant shot back, and then retreated.

The State claims that the evidence was sufficient to show that Hardy's assailant used a handgun. It asserts, without citation to any authority: "[S]ince all three types of ammunition found at the crime scene could be fired from a handgun, there was sufficient evidence before the jury that Brown, found by the jury to be the criminal agent, used a handgun in perpetrating this crime."

Further, the State observes that Wagster's report indicates that two "lead bullets of approximately .41 caliber" were recovered from the "basement steps" and "under the basement steps." Because Hardy testified that his assailant shot

at him in the basement, and because Hardy also testified that he used a weapon that was a .44 or .45, the State maintains that "the other gun being discharged in the basement by the assailant was *arguably* a .41 caliber." (Emphasis added.) It continues: "[A]ccording to Wagster's testimony, a .41 is a handgun round. Thus, Wagster's testimony, coupled with the report, provide sufficient circumstantial evidence" to conclude that Brown "used a handgun as he shot at Hardy."

In a number of cases, including *Beard, supra,* 47 Md.App. 410, 423 A.2d 275, cited by appellant, Maryland's appellate courts have held that evidence to support a conviction for a handgun crime is insufficient unless a jury can find beyond a reasonable doubt that the weapon used met the statutory definition of a "handgun." *See, e.g., Beard,* 47 Md.App. at 412, 414, 423 A.2d 275 (evidence was insufficient to show that weapon was a handgun, where witness described gun in bag as "big ... brown ... rusty [and] old," but did not further describe gun or testify as to size of the bag that contained the gun); *Pharr v. State,* 36 Md.App. 615, 632–33, 375 A.2d 1129 (holding evidence insufficient to show that weapon was a handgun, where witness described a "silver handgun" but defendant's confession described a "silver blank gun," and no weapon was produced at trial), *cert. denied,* 281 Md. 742 (1977).

█ A challenge to whether a weapon meets the statutory definition of a handgun most frequently arises in cases in which the weapon in question is not recovered and thus not produced at trial. Nevertheless, tangible evidence in the form of the weapon is not necessary to sustain a conviction; the weapon's identity as a handgun can be established by testimony or by inference. *Couplin v. State,* 37 Md.App. 567, 578, 378 A.2d 197 (1977), *cert denied,* 281 Md. 735 (1978), *overruled on other grounds by State v. Ferrell,* 313 Md. 291, 299, 545 A.2d 653 (1988); *accord Curtin v. State,* 165 Md.App. 60, 70–72, 884 A.2d 758 (2005), *aff'd,* 393 Md. 593, 903 A.2d 922 (2006); *Gerald v. State,* 137 Md.App. 295, 308–11, 768 A.2d 140, *cert. denied,* 364 Md. 462, 773 A.2d 514 (2001); *Brown v. State,* 64

Md.App. 324, 337, 494 A.2d 999, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985); *Manigault v. State,* 61 Md.App. 271, 287, 486 A.2d 240 (1985); *Johnson v. State,* 44 Md.App. 515, 518–19, 411 A.2d 118, *cert. denied,* 287 Md. 753 (1980).

For instance, the inference that a weapon is "capable of being concealed on the person," C.L. § 4–201(c)(1), has been held permissible where a witness testified that the shooter's hand covered most of the weapon during a shooting, *Manigault,* 61 Md.App. at 287, 486 A.2d 240, and where a witness testified that the defendant had in fact concealed the weapon on his person prior to pointing it at the witness. *Johnson,* 44 Md.App. at 516–19, 411 A.2d 118. In *Gerald,* 137 Md.App. at 309–11, 768 A.2d 140, the Court concluded that witnesses' estimation of a weapon's length by showing the distance between their hands enabled the jury to draw a permissible conclusion that the weapon was shorter than 26 inches and therefore was a "short-barreled shotgun" or "short-barreled rifle" within the definition of a handgun.[15] *See* C.L. § 4–201(c)(2) (" 'Handgun' includes a short-barreled shotgun and a short-barreled rifle."). The cases also indicate that, in the absence of contradictory evidence, the prosecution is not required to introduce specific evidence that the weapon was a firearm; was operable;[16] or was not a toy. *See Mangum,*

---

**15.** Although the Court affirmed Gerald's conviction, "based on the record ... and the deferential standard of review," the *Gerald* Court cautioned that "witnesses siz[ing a] gun by demonstrating a distance between their hands ... is not the proper way to prove a precise element of a crime, which is measured in inches and feet." *Id.* at 311, 768 A.2d 140.

**16.** A weapon must be an operable firearm to sustain a conviction for carrying a handgun. *See Howell v. State,* 278 Md. 389, 364 A.2d 797 (1976) (holding that tear gas pistol was not a handgun because it was not a firearm, i.e., it did not propel a missile by gunpowder or similar explosive (abrogating *Todd v. State,* 28 Md.App. 127, 343 A.2d 890 (1975))); *York v. State,* 56 Md.App. 222, 229, 467 A.2d 552 (1983) (holding that a firearm that is inoperable and not readily rendered operable at the time of use is not a handgun), *cert. denied,* 299 Md. 137, 472 A.2d 1000 (1983). However, the requirement of operability does not apply to convictions for use of a handgun in a felony or crime of violence; the requirement has been legislatively abrogated. C.L. § 4–

*supra,* 342 Md. 392, 676 A.2d 80; *Curtin,* 165 Md.App. at 70–72, 884 A.2d 758; *Brown,* 64 Md.App. at 333–37, 494 A.2d 999; *Couplin,* 37 Md.App. at 575–78, 378 A.2d 197.

To be sure, courts have also held evidence sufficient to conclude that a weapon was a handgun based on eyewitness testimony stating that a handgun was used. *See Curtin,* 165 Md.App. at 70–72, 884 A.2d 758 (witness described the weapon as "a dark colored semi-automatic handgun"); *Facon v. State,* 144 Md.App. 1, 44–45, 796 A.2d 101 (2002) ("loaded .38 gun" was recovered from defendant's car and produced at trial, and witness identified gun as " 'exactly the same thing' " used in the robbery), *rev'd on other grounds,* 375 Md. 435, 825 A.2d 1096 (2003); *Gerald,* 137 Md.App. at 308–11, 768 A.2d 140 (witnesses described gun as a "sawed-off gun," and showed length of gun by demonstrating distance between their hands); *Brown,* 64 Md.App. at 333–37, 494 A.2d 999 (witness described gun as a " 'detective type special' .38 caliber revolver"); *Manigault,* 61 Md.App. at 285–87, 486 A.2d 240 (witnesses described gun as " 'big,' " " 'black,' " and " 'metal,' " one witness described gun as a ".38," and other witness testified that defendant's hand covered most of the gun during the shooting); *Johnson,* 44 Md.App. at 516–19, 411 A.2d 118 (witness testified that she saw "where 'you put the bullets in' " and " 'what you shoot out of,' " and that gun was small enough that it had been concealed in defendant's coat or duffel bag); *Couplin,* 37 Md.App. at 575–78, 378 A.2d 197 (witness described weapon as a " 'handgun' " and as a " 'small pistol' ").

Here, no weapons were recovered. Moreover, Hardy specifically testified that he could not describe the weapons used by his assailants. When asked to "at least say whether they were pistols or rifles or what have you," Hardy responded: "I can say that they found an AKA 47[sic] shell on the floor." [17]

---

204(a) states: "A person may not use . . . any handgun in the commission of a crime of violence . . . or any felony, whether the . . . handgun is operable or inoperable at the time of the crime."

**17.** We observe that the AK–47 is an automatic assault rifle that was originally designed over fifty years ago for the Soviet military by

Given the lack of direct testimony characterizing the weapon as a handgun, coupled with the absence of the weapon itself, the State urges that the ballistics evidence established the use of a handgun by Hardy's assailant. It points out that only .45 and .41 caliber ballistics specimens were recovered from the basement. Moreover, because Hardy testified that he thought the weapon he used was either a .44 or .45, the State reasons that Hardy's assailant "arguably" used a .41 caliber weapon and, according to Wagster, the .41 is exclusively a handgun round. Therefore, the State insists that it may reasonably be inferred "that Brown, who the jury determined was the criminal agent, used a handgun as he shot at Hardy." However, Wagster did not testify as to the caliber of weapon used by Hardy's assailant. Nor did Hardy testify as to the type of weapon used by the assailant, even to say whether it was a handgun. Moreover, the State did not suggest this interpretation of the evidence to the jury in summation.

We have not uncovered any reported cases in Maryland that directly address whether, in the absence of any descriptive witness testimony identifying the weapon as a handgun, and in the absence of production of the actual weapon, a jury can permissibly infer that a weapon was a handgun, based on ballistics evidence recovered at the scene. Under appropriate circumstances, we are satisfied that ballistics evidence may give rise to such an inference. In this case, however, we conclude that such an inference cannot be properly drawn from the evidence so as to satisfy the State's burden of proof. We explain.

In *Woods v. State*, 315 Md. 591, 556 A.2d 236 (1989), the Court of Appeals concluded that ballistics evidence from a crime scene was sufficient to establish the use of a handgun. In that case, however, a handgun was found at the defendant's

---

Mikhail Kalashnikov. Duncan Long, AK47: The Complete Kalashnikov Family of Assault Rifles 7 (1988). It has attained worldwide popularity and perhaps disquieting fame for its durability, low cost, suitability for mass-production, and ease of use. *Id.* at 85. Notably, it utilizes a 7.62 × 39 mm caliber cartridge. *Id.* at 113.

home and produced at trial. The ballistics evidence was used to connect the bullets found at the scene to the defendant's weapon. *Id.* at 622–23, 556 A.2d 236.

Maryland jurisprudence on the "penknife exception" to the dangerous weapons statute, C.L. § 4–101, is instructive, because such cases present issues similar to those that arise under the handgun statutes. With limited exceptions, Maryland prohibits a person to "wear or carry a dangerous weapon of any kind concealed on or about the person," C.L. § 4–101(c)(1), or to "wear or carry a dangerous weapon . . . openly with the intent or purpose of injuring an individual in an unlawful manner." C.L. § 4–101(c)(2). Several types of knives are classified as weapons under the dangerous weapons statute. *See* C.L. § 4–101(a)(5)(i). But, "penkni[ves] without a switchblade" are specifically excepted from the definition of a "weapon." C.L. § 4–101(a)(5)(ii)(2). In *Mackall v. State,* 283 Md. 100, 113 n. 13, 387 A.2d 762 (1978), the Court held that the term "penknife," which is not a defined term in the statute, "encompass[es] any knife with the blade folding into the handle, some very large." [18]

As with handgun cases, Maryland's appellate courts have determined that a defendant could not be convicted of violating the dangerous weapons statute where the evidence was insufficient to show that the defendant's weapon was not a penknife. *See, e.g., Bacon,* 322 Md. at 146–49, 586 A.2d 18; *Washington v. State,* 293 Md. 465, 474–75, 445 A.2d 684 (1982) (evidence was insufficient to show that knife was not a penknife, where knife was not introduced into evidence, and was described only as a " 'long silver knife' " and a " 'sharp pointed object' "); *Mackall,* 283 Md. at 103–113, 387 A.2d 762; *Stanley v. State,* 118 Md.App. 45, 56–57, 701 A.2d 1174 (1997) (evidence was insufficient to show that knife was not a penk-

---

**18.** *See also Bacon v. State,* 322 Md. 140, 146–49, 586 A.2d 18 (1991) (holding that a folding knife with a five-inch blade, which had a safety mechanism that enabled the blade to be locked in the open position (i.e., a "Buck knife"), was a penknife because it had a folding, non-switch blade, regardless of its size and regardless of whether the blade was in the folded or locked position at the time of the alleged offense).

nife, where "State offered no evidence to contradict" evidence showing that knife was, in fact, a penknife), *aff'd in part, vacated in part on other grounds*, 351 Md. 733, 720 A.2d 323 (1998).

*Mackall*, a penknife case, is noteworthy. There, the Court held that there was insufficient evidence that a knife used by the defendant was not a penknife, where the knife was only seen by some of the witnesses, who merely described it as a "knife," without elaboration. *Mackall*, 283 Md. at 109 & n. 8, 111, 387 A.2d 762. In the absence of an unequivocal eyewitness description, the *Mackall* Court considered whether the use of a non-penknife could be inferred from the nature of the wounds inflicted on the victims in the defendant's knife attack. According to the testimony of a police officer who responded to the scene, the wounds suffered by the victims included the following: " 'a sharp instrument wound, a clean-cut wound, approximately four inches across the back of his neck fairly deep' "; " 'a cut on her left arm which required stitches and was also a sharp instrument wound' "; and " 'a laceration on the nose where the tip of the nose was removed.' " *Id.* at 103, 387 A.2d 762.

The Court held that this evidence could not support the inference that a non-penknife was used. It stated, *id.* at 113, 387 A.2d 762:

We summarily reject the State's notion that the nature of the wounds "would at least raise the inference that a pen knife was not used," so that the evidence was sufficient to negate the exception. Although the wounds as described may be "unquestionably consistent with the use of a knife other than a penknife," they are also consistent with the use of a penknife. . . . The inference the State proposes would not prove, beyond a reasonable doubt, that the weapon used was not a penknife without switchblade.

Here, the calibers of the bullets, like the knife wounds in *Mackall*, are evidentiary byproducts of the weapons that were used. Under the *Mackall* Court's reasoning, if such evidence is consistent with weapons that fall into both the prohibited

and non-prohibited categories, it is not sufficient to support the inference that a prohibited weapon was used. In this case, both the 7.62 × 39 caliber bullets and the .45 caliber bullets can be fired from either handguns (prohibited) or rifles (not prohibited); the 7.62 × 39 caliber bullet is primarily a rifle round. Under *Mackall,* therefore, the bullet calibers alone cannot support the inference that a handgun was used.

Appellant's argument also encompasses an even more direct analogy to *Mackall.* He asserts: "No expert testimony was introduced as to what, if any, type of bullet allegedly hit Mr. Hardy. No medical record was introduced as to the size of Mr. Hardy's alleged gunshot wound." In the section of appellant's brief devoted to whether the State proved a "serious physical injury," discussed *infra,* appellant argues:

Based on the evidence adduced at trial, it is unclear whether or when Mr. Hardy was shot. No gun was ever found and the State failed to produce any medical evidence to bolster its argument that the mark on Mr. Hardy's leg [shown in a photograph admitted to evidence] was actually a gunshot wound he suffered during the altercation that night.

\* \* \*

Mr. Hardy did not testify at all as to the extent of his injury or the condition of his alleged gunshot wound at the time of his testimony. The State, over the Appellant's objection, introduced into evidence the pictures of Mr. Hardy's right leg that were taken when Mr. Hardy met with Detective Dohony on June 22, 2005 [four days after the attack]. Detective Dohony, despite the fact that he is not a medical expert, testified that these pictures depicted a gunshot wound to Mr. Hardy's leg. There was no evidence that Mr. Hardy ever received medical treatment for the alleged injury following the attack.

By analogy to *Mackall,* even assuming that the evidence was sufficient to prove that Hardy suffered a gunshot wound, there is no evidence to determine whether the wound was inflicted by a handgun or by a rifle. Based on the evidence,

the nature of Hardy's wound, like the victims' wounds in *Mackall*, cannot support the inference that the injury was inflicted by a handgun, or that the weapon which inflicted it did not fall into a statutory exception to the weapons charge.

 To be sure, when we review a criminal conviction for sufficiency of the evidence, we draw all rational inferences that arise from the evidence in favor of the State. But this precept does not license an appellate court to indulge in rank speculation. "If upon all of the evidence, the defendant's guilt is left to conjecture or surmise, and has no solid factual foundation, there can be no conviction." *Taylor v. State*, 346 Md. 452, 458, 697 A.2d 462 (1997). As we observed in *Dukes v. State*, 178 Md.App. 38, 47–48, 940 A.2d 211, *cert. denied*, 405 Md. 64, 949 A.2d 652 (2008):

> Maryland courts have long drawn a distinction between rational inference from evidence, which is legitimate, and mere speculation, which is not. *See, e.g., Benedick v. Potts*, 88 Md. 52, 55, 40 A. 1067 (1898) ("[A]ny ... fact ... may be established by the proof of circumstances from which its existence may be inferred. But this inference must, after all, be a legitimate inference, and not a mere speculation or conjecture. There must be a logical relation and connection between the circumstances proved and the conclusion sought to be adduced from them."). In *Bell v. Heitkamp*, 126 Md.App. 211, 728 A.2d 743 (1999), we endorsed the following test to distinguish between inference and speculation: " 'where from the facts most favorable to the [party with the burden of proof] the nonexistence of the fact to be inferred is just as probable as its existence (or more probable than its existence), the conclusion that it exists is a matter of speculation, surmise, and conjecture, and a jury will not be permitted to draw it.' " *Id.* at 224, 728 A.2d 743 (quoting *Chesapeake & Potomac Tel. Co. v. Hicks*, 25 Md. App. 503, 524, 337 A.2d 744, *cert. denied*, 275 Md. 750 (1975)).

Here, the inference that the State would have us draw from the evidence, i.e., that Hardy's assailant was armed with a .41

caliber handgun, cannot legitimately be drawn. This is because, even from the facts most favorable to the State, " 'the nonexistence of the fact' " that Hardy's attacker used a .41 caliber handgun " 'is just as probable as its existence (or more probable than its existence)....' " *Bell,* 126 Md.App. at 224, 728 A.2d 743 (citation omitted). We explain.

The State's syllogism proceeds as follows: (1) Hardy believed he was armed with a .44 or a .45; (2) only .45 and .41 caliber ballistics evidence was found in the basement; therefore (3) Hardy must have been armed with a .45 and thus his assailant was armed with a .41, i.e., a handgun. But, the extant evidence does not allow that conclusion to be drawn beyond a reasonable doubt. The sole bullet recovered from Burnett's body was .45 caliber. Neither party suggests that Hardy shot Burnett. Therefore, at least one of the assailants must have been armed with the .45. This undercuts the State's theory that Hardy, and not his assailant, was armed with a .45.

Moreover, the .41 caliber bullets recovered from the basement were located on or under the basement steps, which was the area of the basement at which Hardy was shooting. In contrast, the single bullet fragment recovered from the basement that bore "similar rifling class characteristics" to the .45 caliber bullet found in Burnett's body was found in the basement sink. Diagrams of the crime scene, entered into evidence, showed that the sink was located directly across from the stairs, behind where Hardy was standing. This suggests that the person who was shooting at Hardy used a .45 caliber bullet. Thus, the evidence tends to support an inference contrary to what the State urges: that it was Hardy who was armed with a .41 and his assailant who was armed with a .45. And, as we have seen, Wagster stated that handguns and carbines can both chamber a .45 bullet. Of import here, a carbine is not a handgun.

As to Hardy's statement that he was armed with a .44 or .45, upon which the State's syllogism rests, Hardy explicitly qualified this statement, testifying that the weapon was not

his, that he had no experience with firearms, and that although the weapon "might have been a .44 or a .45," he wasn't "really sure." Hardy also specifically stated that he would not be able to tell the difference between a .44 and a .45.[19]

The evidence did not support the inference that Hardy's assailant was armed with a .41 caliber weapon; it was just as probable that Hardy's assailant was armed with a .45 and that Hardy was armed with a .41, rather than vice versa. Although the evidence did not preclude the proposition that Hardy was armed with a .45, the jury would have had to engage in conjecture in order to conclude that Hardy wielded a .45 and that his assailant wielded a .41.

We recognize that, even if Hardy's assailant was armed with a .45 caliber weapon, the .45 is primarily a handgun round, according to Wagster. Thus, even if Hardy's assailant's weapon was .45 caliber, it is likely that the weapon was a handgun. Nevertheless, we cannot ignore that Wagster indicated that the .45 is not exclusively a handgun round. Because no weapon was placed in evidence, there was no eyewitness testimony of any kind describing the type of weapon that was used as a handgun, and the victim's wounds cannot eliminate the possibility that the assailant used a rifle rather than a handgun, we look to the ballistics evidence. We find no support in our case law for the proposition that a person may be convicted of a handgun offense based on ballistics evidence that is consistent with use of either a handgun *or* a firearm that is not a handgun under C.L. § 4–

---

**19.** Given that Hardy indicated that he might not be able to distinguish a .44 from a .45, we point out that the Smith & Wesson Model 57 .41 Magnum, the revolver for which the .41 caliber handgun round was developed, is very similar in appearance to Smith & Wesson's Model 24 Magnum revolver, the .44 caliber handgun which achieved notoriety in popular culture as the iconic weapon wielded by Clint Eastwood's cinematic character "Dirty Harry." *See* Dean K. Boorman, The History Of Smith & Wesson Firearms 10, 118–19 (2002). As noted, Hardy testified unequivocally that he fired a revolver. But, the .45 caliber bullet recovered from Burnett's body, which bore "similar rifling class characteristics" to the bullet fragment found in the basement sink, was identified by Wagster's report as a round for an automatic weapon.

201(c), even if the more likely use was of a handgun. Here, based on the ballistics evidence, the jury could not have determined, beyond a reasonable doubt, that Hardy's assailant used a weapon that met the statutory definition of a handgun. Therefore, appellant's two handgun convictions must be reversed.

### C.

Appellant contends that his assault convictions must also be reversed. He argues that "a rational juror could not have found that Appellant committed the crime of first degree assault on Mr. Hardy because the State failed to establish that Mr. Hardy suffered any serious physical injuries," as that term is statutorily defined.

The State counters that the contention is not preserved. It cites appellant's motion for acquittal, in which his counsel said:

I'm going to pose to the court that [Hardy] was never shot and the reason for that is we have no medical record. We have no medical record for Mr. Hardy. The State wants everybody to believe that somebody gets shots [sic] immediately goes to the hospital. Mr. Hardy never went to the hospital that we know of there because there's no evidence of it.

According to the State, appellant "now advances an entirely different theory on the sufficiency of evidence with respect to his first degree assault charge: that, 'the State failed to establish that Mr. Hardy suffered any serious physical injuries.' " The State's position appears to be that an argument that there are no *serious* physical injuries is distinct from an argument that there are no injuries at all.

Although we disagree with the State's claim as to preservation, appellant's claim fails on the merits. We explain.

Assault in the first degree is prohibited by C.L. § 3–202(a), and may be committed in alternative ways. The statute provides, in part:

1. A person may not intentionally cause or attempt to cause serious physical injury to another.

2. A person may not commit an assault with a firearm, including:

(i) a handgun, antique firearm, rifle, shotgun, short-barreled shotgun, or short-barreled rifle . . . ;

(ii) an assault pistol . . . ;

(iii) a machine gun . . . ; and

(iv) a regulated firearm. . . .

"Serious physical injury" is defined in C.L. § 3–201(d):

"Serious physical injury" means physical injury that:

(1) creates a substantial risk of death; or

(2) causes permanent or protracted serious:

(i) disfigurement; [20]

(ii) loss of the function of any bodily member or organ; or

(iii) impairment of the function of any bodily member or organ.

Appellant contends that the evidence submitted at trial to establish that Hardy was injured consisted solely of Detective Dohony's testimony that Hardy and Hardy's girlfriend told Dohony that Hardy had been injured, and the photograph that Dohony identified as being a picture of a gunshot wound to Hardy's thigh. He notes that Hardy did not testify as to his injuries, and Dohony identified the photo over appellant's objection that Dohony's lack of medical expertise disqualified him from identifying the picture as depicting a gunshot wound. Appellant also states that no evidence of Hardy's medical treatment was introduced. Further, he argues:

Based on the evidence adduced in the trial, it is unclear whether or when Mr. Hardy was shot. No gun was ever

---

**20.** "Disfigurement," under C.L. § 3–201(d), means " 'an externally visible blemish or scar that impairs one's appearance.' " *Thomas v. State,* 128 Md.App. 274, 303, 737 A.2d 622 (citation omitted), *cert. denied,* 357 Md. 192, 742 A.2d 521 (1999).

found and the State failed to produce any medical evidence to bolster its argument that the mark on Mr. Hardy's leg was actually a gunshot wound he suffered during the altercation that night. Absent evidence that the alleged attack caused any impairment to Mr. Hardy's leg, or that the mark Mr. Hardy sustained did not heal or fade by the time of the trial, this Court must reverse the conviction for first degree assault.

Brown elaborates:

[T]he State failed to produce any evidence as to the condition of Mr. Hardy's scar *at the time of the trial*—the State failed to inquire, and Mr. Hardy did not testify, as to the state of the scar. It is quite possible that Mr. Hardy's scar had healed or disappeared by the time of Mr. Hardy's testimony before the jury, thereby precluding a conviction on the basis of a permanent, protracted blemish or scar. . . . Without the medical records, medical testimony, or any evidence of the scar in evidence before the jury at the time of the trial, a rational juror could not have found that Mr. Hardy suffered any serious physical injuries during the night of the incident. (Emphasis in original.)

We reject appellant's claim that the evidence did not show whether or when Hardy was shot. A photograph of Hardy's gunshot wound to his right leg was taken by the police on June 22, 2005, four days after the shooting. It was admitted into evidence. Detective Dohony testified that the injury depicted in the photograph was a gunshot wound. Moreover, the day after the shootings, Detective Dohony spoke with Hardy's girlfriend, Shaneka Brooks. She informed Dohony that Hardy had told her that he was shot during this incident. Further, Detective Dohony testified that Hardy told him during the interview that he thought he had been shot at Burnett's residence.[21]

Nevertheless, even assuming that appellant is correct that a "serious physical injury" was not established, a

---

**21.** Defense counsel did not object on hearsay grounds to Dohony's statements regarding what Hardy and Brooks had told him.

"serious physical injury" is not necessary for a conviction for first-degree assault. Under C.L. § 3–202(a)(2), any assault with a "firearm" qualifies as first-degree assault. And, all firearms, including those excepted from the definition of "handgun," are included. Appellant does not contend that the attack on Hardy did not involve a firearm. But, even if he did, Hardy's testimony and the ballistics evidence already reviewed would be sufficient to sustain the conviction.

Further, C.L. § 3–202(a) permits conviction for first-degree assault based on an attempt to cause "serious physical injury," not merely a completed injury. *See Lamb v. State,* 93 Md.App. 422, 429, 613 A.2d 402 (1992) (crime of "assault" includes attempted battery), *cert. denied,* 329 Md. 110, 617 A.2d 1055 (1993); C.L. § 3–201(b) (" 'Assault' means the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings."). Thus, even if Hardy had not been struck in the attack, the evidence would be sufficient to support his attacker's conviction for first-degree assault based on Hardy's undisputed testimony that his assailant intentionally shot at him. The intent require-ment of assault in either the attempted-battery-with-a-firearm variety or the attempt-to-cause-serious-physical-injury variety can be amply inferred from the assailant's shooting at Hardy. *Chilcoat v. State,* 155 Md.App. 394, 403, 843 A.2d 240 (when considering whether a defendant is guilty of first-degree as-sault, "the jury may 'infer that "one intends the natural and probable consequences of his act" ' ") (citations omitted), *cert. denied,* 381 Md. 675, 851 A.2d 594 (2004).

**D.**

Finally, appellant urges us to reverse his convictions, claiming the evidence was legally insufficient to establish that he "was at the crime scene." According to appellant, "a reasonable jury could not have found, beyond a reasonable doubt, that Mr. Brown was one of the intruders who broke into the house and assaulted Mr. Hardy." Appellant argues: "In this case, the State presented a largely circumstantial case

relying heavily upon equivocal, unreliable identification by a single eyewitness." Although the signed photo array was admitted into evidence, appellant maintains that the pre-trial identification was not sufficient evidence of appellant's criminal agency to support his conviction.[22]

In particular, appellant asserts: "Mr. Hardy ... recanted his previous identification and testified during the trial ... that Mr. Brown 'is not the man [who] shot [him].' " Thus, Brown maintains that "the State's only direct evidence of Appellant's presence at the crime scene is [a] recanted claim by a person formerly fearful of his own criminal exposure...." Noting that Hardy is "the only living eyewitness to the crime," appellant adds: "There is no evidence that [appellant] knew either victim. There is no evidence he had any motive to attack them. There is no weapon tying him to these crimes. There is no ballistic evidence, no fingerprint placing him at the crime scene." In his view, Hardy's testimony "was too inconclusive, contradictory and uncertain to establish" that appellant committed the offenses.

In addition, appellant argues:

Based on the record, it is clear that Mr. Hardy never was certain as to the identification of the intruders. His story is simply too inconsistent to be believed by any rational juror.

\* \* \*

Mr. Hardy never made a positive identification of anyone in this matter.... At most, Mr. Hardy said in his photo array police interview, eleven days after the attack, that Appellant 'could have been' one of the intruders. Of course, the critical fact remains that shortly before the trial and during it, Mr. Hardy admitted that even this equivocal statement was the fruit of suggestive police comments in an intimidating setting.

---

**22.** As noted, appellant moved before trial to suppress Hardy's photo identification of appellant, but on appeal, he does not challenge the court's denial of the motion. At oral argument, appellant's counsel specifically confirmed that appellant does not challenge the admissibility of the pre-trial photo identification.

The State relied upon its DNA evidence to overcome the manifest weakness of the identification testimony. Yet, the DNA evidence in this record should give no such comfort.... [T]he DNA analyst established only the possibility that Appellant's DNA may have been recovered from a piece of crime scene evidence. The expert acknowledged that she could not reach a certain conclusion on this quantum of evidence—and she never established that her analysis even assessed the possibility that Mr. Hardy, the surviving victim, might have been the actual source of the partial DNA match she described.

Appellant concludes:

In this case, where the jury declared itself deadlocked, and then reached finality only with an apparent compromise, it is obvious that the risk of conviction existed even if the proofs and the theory of the case were not compelling. Yet, there, the evidence did not suffice.

Viewing the evidence in [the] light most favorable to the State, there was insufficient credible evidence establishing Mr. Brown's presence at the Burnett house beyond a reasonable doubt; therefore, this Court must reverse his conviction on all charges.

The State counters: "In presenting this ... claim, Brown is essentially requesting this Court to relitigate his case and make determinations on matters such as the credibility of Hardy, which is improper." The State summarizes the evidence presented at trial, which included Hardy's prompt identification of Brown in a photo array; Hardy's testimony that he did not know whether he shot his assailant; Brown's presentation at the hospital on the date in question with a gunshot wound to the foot, a missing shoe, and an explanation that could not be corroborated; his use of a false name; and his departure from the hospital before treatment, and despite having been instructed to remain.[23]

---

**23.** The State does not rely on the DNA evidence presented at trial, which did not inculpate appellant. Rather, appellant could "not be

The State dismisses Brown's reliance on Hardy's recantation, asserting: "Given that the victim identified Brown as the criminal agent in a photographic array, the evidence was sufficient to sustain the jury's determination that Brown was present at the crime scene." It adds (internal citations omitted):

Hardy's recantation simply forced the jury to weigh the credibility of Detective Dohony versus Hardy. By its verdict, the jury obviously rejected Hardy's recantation and determined that Detective Dohony's testimony had more credibility. This is not surprising given the [evidence] supporting Brown's guilt.... In short, by his appeal, Brown seeks to have this Court insert itself as the factfinder and second-guess witness credibility determinations made by the jury.

Appellant concedes that the testimony of a single eyewitness may be sufficient to prove guilt beyond a reasonable doubt. *See Branch v. State,* 305 Md. 177, 184, 502 A.2d 496 (1986). Nevertheless, he argues that "there are limits to this general rule." Because Hardy, at trial, contradicted his pretrial identification of Brown, appellant contends that Hardy's testimony "was too inconclusive, contradictory and uncertain to establish" appellant's culpability. Appellant seeks support for his position in *Kucharczyk v. State,* 235 Md. 334, 337, 201 A.2d 683 (1964), in which the Court of Appeals held that the "testimony of [a] witness, who was the only person that testified as to any overt act on the part of the appellant, was so contradictory that it lacked probative force and was thus insufficient to support a finding beyond a reasonable doubt of the facts required to be proven."

In our view, appellant's reliance on *Kucharczyk* is misplaced. In that case, the lone witness to the alleged crime was "a mentally deficient 16–year–old boy [with] a full scale I.Q. of

---

excluded" as a contributor to a sample taken from the crime scene. Although appellant moved to exclude the DNA evidence at trial, he has not raised on appeal the question of the admissibility of the DNA evidence.

56. . . ." *Id.* at 336, 201 A.2d 683. On the stand, the witness gave directly conflicting answers to the same repeated question. *Id.* at 337–38, 201 A.2d 683. The Court held that such testimony, wherein " 'a witness says in one breath that a thing is so, and in the next breath that it is not so . . . is too inconclusive, contradictory, and uncertain, to be the basis of a legal conclusion.' " *Id.* at 338, 201 A.2d 683 (citation omitted).

The testimony of the lone witness in *Kucharczyk* was *internally* inconsistent. In this case, there was no internal inconsistency in Hardy's trial testimony. Rather, Hardy's trial testimony contradicted his prior identification of appellant in a photo line-up; Hardy was unequivocal in his claim at trial that appellant was not his assailant.

In *Wilson v. State,* 261 Md. 551, 556–58, 276 A.2d 214 (1971), the Court of Appeals held that a witness's testimony, which wholly contradicted the statement the witness gave to the police, was not barred by *Kucharczyk.* The *Wilson* Court explained: "The jury was well aware of the prior inconsistent statement of the witness . . . and was faced with judging her credibility in the light of such inconsistency. That, of course, is a task for the jury rather than the appellate tribunal." *Id.* at 558, 276 A.2d 214.

Writing for this Court in *Bailey v. State,* 16 Md.App. 83, 93–97, 294 A.2d 123 (1972), Judge Moylan exhaustively described the limits of the so-called *"Kucharczyk* doctrine." The Court noted that, "[d]espite the limited utility of the doctrine, the life of *Kucharczyk* has been amazing for the number of occasions on which and the number of situations in which it has been invoked in vain." *Id.* at 95, 294 A.2d 123. Of import here, in reciting a variety of situations in which citation to *Kucharczyk* was inapposite, we began with the example that *"Kucharczyk* does not apply simply because a witness's trial testimony is contradicted by other statements which the witness has given out of court. . . ." *Id.* (eight supporting citations omitted).

Almost thirty years later, in *Pittman v. Atlantic Realty Co.,* 359 Md. 513, 754 A.2d 1030 (2000), the Court of Appeals again rejected the extension of *Kucharczyk.* Quoting *Bailey's* dis-

quisition on *Kucharczyk, id.* at 544–46, 754 A.2d 1030 the Court observed: "From the time that Judge Moylan wrote *Bailey* to date, no opinion of this Court or of the Court of Special Appeals has encountered a set of facts that justified applying the *Kucharczyk* approach." *Id.* at 546, 754 A.2d 1030. And, we are unaware of any such opinion in the intervening years between *Pittman* and this case.

In sum, *Kucharczyk* "is clearly distinguishable from [a] case [in which] the State's witness told but one consistent story at the trial." *Montgomery v. State*, 17 Md.App. 119, 127, 300 A.2d 218, *cert. denied*, 269 Md. 763 (1973). It "has no application where [witness] testimony is [merely] inconsistent with an out of court statement." *Alexander v. State*, 4 Md.App. 214, 218, 242 A.2d 180, *cert. denied*, 251 Md. 747 (1968).[24]

Rejection of the analogy to *Kucharczyk* does not end our inquiry. The question remains whether there was sufficient evidence to support appellant's conviction, notwithstanding Hardy's unequivocal testimony at trial that appellant did *not* attack him.

As noted, Hardy made a pre-trial photographic identification. Maryland Rule 5–802.1 (2008) expressly permits the substantive admission of certain prior statements made by a witness who testifies at trial and is subject to cross-examination, as was Hardy here. In pertinent part, the rule provides:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-

---

**24.** Appellant has not cited *Gibbs v. State*, 7 Md.App. 35, 253 A.2d 446 (1969). In our view, it is *Gibbs*, and not *Kucharczyk*, that stands for the proposition appellant advances: a pre-trial identification may not be sufficient evidence of guilt if the identification is recanted by the witness at trial. However, *Belton v. State*, 152 Md.App. 623, 833 A.2d 54, *cert. denied*, 378 Md. 617, 837 A.2d 928 (2003), sounded the death knell for the "*Gibbs* exception." In the *Belton* Court's view *Gibbs* was "effectively overruled" by Rule 5–802.1. *Id.* at 638–39, 833 A.2d 54. As the *Belton* Court explained, with the enactment of Rule 5–802.1, "[i]nconsistent extrajudicial statements are now admitted as substantive evidence. As a result, the jury has the responsibility of weighing the evidence and the credibility of the witnesses." *Id.* at 638, 833 A.2d 54.

examination concerning the statement are not excluded by the hearsay rule:

\* \* \*

(iii) A statement that is one of identification of a person made after perceiving the person. . . .

Here, the jury was entitled to consider Hardy's pre-trial identification of appellant from a photo array of six photos. Hardy admitted at trial that he had identified appellant in the array, but claimed that his reason for doing so was that the detectives had asked specifically about appellant's picture, and Hardy "rode with it," because he "wasn't going to sit there in their house and tell the Homicide detectives that yes you made me point him out right in their face. I was scared to do that." However, Detective Dohony disputed Hardy's version of events with respect to the identification. He explicitly testified that, during the unrecorded "pre-interview," Hardy indicated, without hesitation or equivocation, that appellant was the shooter.[25]

Appellant does not contend that Hardy's pre-trial identification was inadmissible. The fact that the jury was presented with evidence that appellant was the perpetrator, in the form of Hardy's pre-trial photo identification and Dohony's testimony, as well as evidence that he was not the perpetrator, in the form of Hardy's trial testimony, made the issue of identification a credibility question for the jury. Put another way, Hardy's recantation at trial simply required the jury to evaluate the credibility of the witnesses. The jury was entitled to credit Hardy's pre-trial identification of appellant as the assailant, as well as Dohony's version of the events pertaining to that identification, and to discredit Hardy's account at trial. *See Owens v. State,* 170 Md.App. 35, 102, 906 A.2d 989 (2006) ("[I]t is the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses."), *aff'd,* 399 Md. 388,

---

**25.** As noted, in Hardy's recorded pre-trial statement, which was not played for the jury, he stated only that appellant "look[ed] like he could be" Hardy's assailant.

924 A.2d 1072 (2007), cert. denied, —— U.S. ——, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008). Moreover, the jury clearly considered the other probative evidence, which included Hardy's testimony that he fired several shots at his assailant; appellant's presentation at the hospital on the night in question, with a gunshot wound; Brown's fabrication of a robbery; Brown's use of a false name at the hospital; and Brown's sudden departure from the hospital, before treatment and despite having been told by the police to remain at the hospital.

We decline appellant's invitation to substitute Brown's view of the evidence for that of the jury.

**JUDGMENTS REVERSED AS TO USE OF A HANDGUN AND WEARING, CARRYING, AND TRANSPORTING A HANDGUN. JUDGMENTS OTHERWISE AFFIRMED. COSTS TO BE PAID 50% BY MAYOR AND CITY COUNCIL OF BALTIMORE, 50% BY APPELLANT.**